**V I R G I N I A:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

| | | |
|---|---|---|
| AMJAD H. KHAN, et al. | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) Case No.: CL 2014-05703 | |
| | ) | |
| COMMONWEALTH TRUSTEES, | ) | |
| LLC, et al., | ) | |
| | ) | |
|     Defendants. | ) | |

### ORDER

THIS CAUSE was heard on this 11ᵗʰ day of July, 2014, upon Plaintiff's Motion for

Leave to Add New Parties and Amend the Pleadings; and was argued by counsel.

IT APPEARING TO THE COURT that the ends of justice require the addition of new

parties and amended pleadings; it is hereby

ADJUDGED, ORDERED AND DECREED that Plaintiff is granted leave to add new

parties and amend the pleadings; and that Plaintiff's Amended Complaint shall be filed as of

July 11, 2014 and that Commonwealth Trustees, LLC and Wells Fargo, N.A., shall have 21 days

after the date of filing, to file their responsive pleadings.

AND THIS MATTER IS FINAL.

ENTERED THIS __11__ day of __July__, 2014.

_____
Fairfax County Circuit Court Judge

Seen and Agreed:

_____
Stephanie A. Laufer – V.S.B. No. 83103
Soo Kang Keithley – V.S.B. No. 44910
10560 Main Street, Suite 319
Fairfax, Virginia 22030
Telephone: (703) 865-7710
Facsimile:  (703) 865-7706
Stephanie.laufer@keithleylaw.com
Counsel for Plaintiffs

Seen and _____:

_____
Mark D. Meyer – V.S.B. No. 74290
Sara Tussey - V.S.B. No. 79826
Rosenberg & Associates
7910 Woodmont Ave., Suite 750
Bethesda, MD 20814
(301) 907-8000 (Tel.)
(301) 907-8101 (Fax)
Counsel for Commonwealth Trustees, LLC

EXHIBIT
A

Seen and _____:
Amy S. Owen
John D. Ferman
BrigliaHundley, P.C.
3975 University Drive, Suite 100
Fairfax, VA 22030
703-883-9101 (tel)
703-942-8092 (fax)
Counsel for Wells Fargo Bank, N.A.

A COPY TESTE:
JOHN T. FREY, CLERK
BY: _____
        Deputy Clerk
Date: _____
Original retained in the office of
the Clerk of the Circuit Court of
Fairfax County, Virginia

**VIRGINIA:**

## IN THE CIRCUIT COURT OF FAIRFAX COUNTY

**FILED**
IN COURTROOM
7/11/14
ECW
(INITIAL)
JOHN T. FREY
Clerk of the Circuit Court
of Fairfax County, VA

| | |
|---|---|
| **AMJAD H. KHAN,** | ) |
| Plaintiff(s), | ) |
| | ) |
| **v.** | ) |
| | ) |
| **COMMONWEALTH TRUSTEES, LLC,** | ) **Case No.: CL 2014-05703** |
| And | ) |
| **WELLS FARGO BANK, NATIONAL ASSOCIATION** | ) |
| And | ) |
| **PNC BANK, NATIONAL ASSOCIATION,** | ) |
| SERVE: Corporation Service Company | ) |
| Bank of America Center, 16th fl. | ) |
| 1111 East Main Street | ) |
| Richmond, VA 23219 | ) |
| And | ) |
| **WOODS ROGERS, PLC** | ) |
| SERVE: George Leloudis, Ex. Director | ) |
| 10 South Jefferson St., Ste. 1400 | ) |
| Roanoke, VA 24038 | ) |
| Defendants. | ) |

## AMENDED COMPLAINT TO SET-ASIDE FORECLOSURE SALE

COMES NOW the Plaintiff, AMJAD H. KHAN, (the "Plaintiff") by Counsel,

and under oath, and for his claims against the Defendants, COMMONWEALTH

TRUSTEES, LLC, WELLS FARGO BANK, NATIONAL ASSOCIATION, PNC

BANK, NATIONAL ASSOCIATION, and WOODS ROGERS PLC (the "Defendants"),

submit their Amended Complaint to Set-Aside Foreclosure Sale, and in support thereof, state the following:

1.      Plaintiff Amjad H. Khan (hereinafter "Amjad") is a resident of the Commonwealth of Virginia, currently residing at 3301 Rose Lane, Falls Church, Virginia 22042 (the "Property").

2.      Defendant Commonwealth Trustees, LLC, (hereinafter "CT") is a limited liability company, licensed to transact business in the Commonwealth of Virginia.

3.      Defendant Wells Fargo Bank, National Association, (hereinafter "Wells Fargo") is a National Corporation licensed to transact business in the Commonwealth of Virginia.

4.      PNC Bank, National Association, (hereinafter "PNC") is a National Corporation licensed to transact business in the Commonwealth of Virginia.

5.      Woods Rogers PLC (hereinafter "Woods") is a law firm, licensed to practice in the Commonwealth of Virginia.

6.      Amjad first purchased the Property on August 30, 1991, which was secured by a First Trust to secure a loan from World Savings and Loan Association in the amount of $184,500.00. (A copy of the Trust is appended hereto as "Exhibit A" and hereinafter referred to as "First Trust").

7.      On or about June 3, 2013, CT, was appointed by Wells Fargo, the alleged assignee of First Trust, as substitute trustee under the First Trust. (A copy of the Substitute Trustee Deed recorded on June 14, 2013, is appended hereto as "Exhibit B").

8.      On or around 2011, Amjad applied for a loan modification with Wells Fargo.

9.     Wells Fargo accepted the application and communicated with Amjad regarding the application, however, it never made a final determination.

10.     Wells Fargo ceased to mail Amjad mortgage statements while the application was pending, therefore, Amjad did not receive statements from the date of application to the date of foreclosure.

11.     On or about July 25, 2013, CT held a foreclosure sale, at which time PNC purchased the Property.

12.     Amjad did not receive a demand or acceleration letter from Wells Fargo at any time prior to foreclosure.

13.     Plaintiff did not receive written or actual notice of the foreclosure sale until after the Property had been sold, and after the fact, discovered that the written notices had been sent to the incorrect address.  (A copy of the notices provided by CT in its Demurrer are attached hereto as Exhibit "C"; and a copy of the USPS tracking data for the notices is attached hereto as Exhibit "D").

14.     The notices of foreclosure sale were mailed to 3301 Rose Lane, Annandale, Virginia 22042, whereas the Property's correct and actual address is 3301 Rose Lane, Falls Church, Virginia, 22042.

15.     The purchaser of the Property, PNC, filed an Unlawful Detainer in this Court against Amjad and his brother, Anowar Khan (hereinafter "Anowar") on November 22, 2013, for possession of the Property. (Case No. CL 2013-0017777).

16.     PNC continued the case while it entered into a Regional Sales Contract with Anowar for purchase of the Property,

17.     After Anowar obtained financing approval and provided a $100,000.00

earnest money deposit, PNC cancelled the sale on the date of settlement, without notice to Anowar, and moved for default judgment in the unlawful detainer case just four days later.

18.    Default judgment was denied, and on or about March 13, 2014, Amjad and Anowar filed a Counter-Claim against PNC for Breach of Contract, seeking specific performance of the Regional Sales Contract, and/or damages.  (The case is still pending and set for trial on November 20, 2014).

19.    Amjad then initiated this action and filed their Complaint to Set-Aside Foreclosure Sale ("Complaint") against CT and Wells Fargo on April 25, 2014, alleging that CT and Wells Fargo breached the First Trust, and seeking rescission of the foreclosure sale.

20.    CT filed its Demurrer Or In the Alternative Plea in Bar in response to the Complaint, and on June 13, 2014, CT's Demurrer as to Breach of Contract was sustained, and Amjad was granted leave to amend its count for rescission against CT to seek money damages.

21.    Since initiating this action, Plaintiff has become aware of new facts and claims that merit an amendment of claims against Wells Fargo and CT, and that require the addition of new parties to this case: PNC and Woods.

## I. BREACH OF CONTRACT – WELLS FARGO

22.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1-21 above.

23.    Paragraph 15 of the First Trust provides:

"This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations including those for

federal savings and loan associations, called "Federal Law." In the event that any of the terms or provisions of this Security Instrument or the Secured Note are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Note.

24.     Paragraph 28 of the First Trust provides:

"If there is a Breach of Duty by me, Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

"Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.""

25.     Pursuant to the First Trust, Wells Fargo and CT had a duty to comply with Federal and Applicable (Virginia) law regarding notice requirements and foreclosure proceedings.

26.     The Federal notice requirements are outlined in <u>12 U.S.C.A. § 3757</u>, which provides:

"The notice of default and foreclosure sale to be served in accordance with this chapter shall set forth--
(1) the name and address of the foreclosure commissioner;
(2) the date on which the notice is issued;
(3) the names of—
(A) the Secretary; (B) the original mortgagee (if other than the Secretary); and (C) the original mortgagor;
(4) the street address or a description of the location of the security property, and *a description of the security property, sufficient to identify the property to be sold;*
(5) the date of the mortgage, the office in which the mortgage is recorded, and the liber number and folio or other appropriate description of the location of recordation of the mortgage;
(6) *identification of the failure to make payment, including the due date of the earliest installment payment remaining wholly unpaid as of the date on which the notice is issued upon which the foreclosure is based, or a description of any other default or defaults upon which foreclosure is based, and the acceleration of the secured indebtedness;*

(7) the date, time, and location of the foreclosure sale;

(8) a statement that the foreclosure is being conducted pursuant to this chapter;

(9) a description of the types of costs, if any, to be paid by the purchaser upon transfer of title;

(10) the amount and method of deposit to be required at the foreclosure sale (except that no deposit shall be required of the Secretary) and the time and method of payment of the balance of the foreclosure purchase price; and

(11) any other appropriate terms of sale or information, as the Secretary may determine." (emphasis added)

27.     The Applicable or Virginia notice requirements include § 55-59.1 of the

1950 Virginia Code, as amended (the "Code"), which provides:

"A. In addition to the advertisement required by § 55-59.2 the trustee or the party secured shall give written notice of the time, date and place of any proposed sale in execution of a deed of trust, which notice shall include either (i) the instrument number or deed book and page numbers of the instrument of appointment filed pursuant to § 55-59, or (ii) said notice shall include a copy of the executed and notarized appointment of substitute trustee by personal delivery or by mail to (i) the present owner of the property to be sold at his last known address as such owner and address appear in the records of the party secured..."

28.     Plaintiff did not receive advance written notice of the foreclosure sale

because the written notices were mailed to the incorrect address: 3301 Rose Lane,

Annandale, VA, 22042; which address does not exist. (Plaintiff's Property is located at

3301 Rose Lane, **Falls Church**, Virginia 22042).

29.     Further, the un-received notices were insufficient in that they contained

only the date, time and location of sale; contained the incorrect property address; and

referred to an advertisement published in the Washington Post, which advertisement does

not exist.

30.     In addition to written notice, § 55-59.2 of the Code imposes a requirement

that the lender and/or trustee publish an advertisement for notice of foreclosure in a local

periodical, providing, in relevant part:

"A. Advertisement of sale by a trustee or trustees in execution of a deed of trust

shall be in a newspaper having a general circulation in the city or county wherein the property to be sold, or any portion thereof, lies pursuant to the following provisions:

1. If the deed of trust itself provides for the number of publications of such newspaper advertisement, which may be done by using the words "advertisement required" or words of like purport followed by the number agreed upon, then no other or different advertisement shall be necessary, provided that, if such advertisement be inserted on a weekly basis it shall be published not less than once a week for two weeks and if such advertisement be inserted on a daily basis it shall be published not less than once a day for three days, which may be consecutive days, and in either case shall be subject to the provisions of § 55-63 in the same manner as if the method were set forth in the deed of trust;"

Further, § 55-59.3 elaborates the requirement under § 55-59.2 by providing that the advertisement of sale under any deed of trust, "shall set forth a description of the property to be sold, and shall identify the property by street address, if any, or, if none, shall give the general location of the property with reference to streets, routes, or known landmarks."

31.    The advertisements failed to satisfy § 55-59.3 of the Code because they were advertisements for sale of a property that does not exist: 3301 Rose Lane, Annandale, Virginia; whereas the Property sold is located in Falls Church, Virginia.

32.    Paragraph 28 of the First Trust created an obligation on the lender to make a demand for fully payment upon a Breach of Duty.

33.    Wells Fargo never made a demand for full payment of the First Trust upon default by Amjad, which is a condition precedent to foreclosure or appointment of receiver.

34.    § 55-59(7) of the Code provides, *in relevant part*:

"In the event of default in the payment of the debt secured, or any part thereof, at maturity, or in the payment of interest when due, or of the breach of any of the covenants entered into or imposed upon the grantor, then at the request of any beneficiary the trustee shall forthwith *declare all the debts and obligations*

*secured by the deed of trust at once due and payable* and may take possession of the property and proceed to sell the same at auction..." (emphasis added)

35.     Wells Fargo breached the First Trust by failing to make a demand for full payment; by failing to satisfy the Federal and Virginia statutory notice requirements for foreclosure proceedings, which deprived Amjad of any opportunity to cure the default, stay foreclosure proceedings, or purchase the Property at foreclosure.

36.     Wells Fargo breached its duty to Plaintiff, by and through its appointed agent, CT, which likewise failed to satisfy the relevant statutory notice requirements for default and foreclosure sale.

**WHEREFORE,** Plaintiff, AMJAD H. KHAN, respectfully requests that this Court enter judgment against Wells Fargo, and enter an Order setting aside the foreclosure sale, or in the alternative, award Plaintiff money damages equal to the fair market value of the Property; award Plaintiff his costs incurred herein, and for such other and further relief this Court deems necessary.

## II. BREACH OF FIDUCIARY DUTY- COMMONWEALTH TRUSTEES, LLC

37.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1-36 above.

38.     On or about June 3, 2013, CT, was appointed by Wells Fargo as substitute trustee under the Deed of Trust.

39.     § 55-59(9) of the Code, provides, *in relevant part:*

"When the instrument of appointment has been executed, the substitute trustee or trustees named therein shall be vested with all the powers, rights, authority and duties vested in the trustee or trustees in the original deed of trust."

40.     A breach of fiduciary duty exists where 1) a fiduciary duty is owed to the party; 2) that duty is breached; and 3) the breach results in a loss to the party to whom the

duty is owed.

41.    Pursuant to the terms of the First Trust, CT, was vested with the duties

vested in the original trustee, and therefore had a fiduciary duty to both parties under the

First Trust to protect their respective interests.

42.    CT had a duty to act in accordance with the terms of the First Trust, which

not only mandated adherence to Federal law and regulations, but also imposed an

obligation to comply with Virginia's notice requirements in the event of default and

foreclosure.

43.    CT had an obligation to act pursuant to § 55-59(7) of the Code, which

provides that the trustee shall declare all debts and obligations secured by the deed of

trust at once due and payable prior to selling the Property.

44.    CT breached that obligation by failing to make such a declaration.

45.    Pursuant to Paragraph 28 of the First Trust, § 55-59 et seq. of Code, and

12 U.S.C.A. § 3757, CT had a duty to provide Amjad with notice of foreclosure by

mailing him written notices of foreclosure, and by advertising the imminent foreclosure

sale of his Property in a local periodical.

46.    CT breached its duties to Amjad by failing to send written notice of

default/demand for payment; failing to send written foreclosure notices to the correct

address, failing to satisfy the content requirements for the written notices; and failing to

publish correct advertisements. (See exhibits C and D).

47.    As a result of the breaches by CT, Amjad did not receive notice of default

and did not have an opportunity to cure the default; and Amjad did not receive notice of

foreclosure sale, which ultimately caused Amjad to lose of ownership of his house.

**WHEREFORE**, the Plaintiff, AMJAD H. KHAN, respectfully requests that this Court enter judgment against CT, and award Plaintiffs money damages equal to the fair market value of the Property; award Plaintiffs punitive damages in the amount of $100,000.00, and award Plaintiffs their costs and attorney's fees incurred herein.

### III. BREACH OF FIDUCIARY DUTY – WELLS FARGO AND COMMONWEALTH TRUSTEES, LLC

48.     Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1-47 above.

49.     A little over one year prior to foreclosure, Amjad applied for a loan modification of the First Trust through Wells Fargo; which application was still pending at the time Wells Fargo referred the First Trust to foreclosure.

50.     Pursuant to Federal law: Chapter II, Part 3 of Making Homes Affordable Program (hereinafter "MHA") provides that a servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale when a borrower has submitted a request for MHA consideration, and no final determination has yet been made. (A copy of Chapter II, Part 3 is attached hereto as Exhibit "E").

51.     At the time that Wells Fargo referred the First Trust to foreclosure and appointed CT as substitute trustee, Amjad's request for loan modification was pending a final determination, and Wells Fargo was therefore precluded from initiating foreclosure proceedings.

52.     Additionally, pursuant to Chapter II, Part 3.4.2: "Servicers must ensure that their foreclosure attorney/trustee adheres to all of the requirements of Section 3.1, Section 3.2 and Section 3.3 with respect to referral to foreclosure, stay of foreclosure actions and suspension of foreclosure sales."

53.     Wells Fargo, as the "servicer" of the First Trust which is construed under federal law, had a duty to adhere to, and to ensure its foreclosure trustee, CT, adhered to all of the requirements of Chapter II, Section(s) 3.1, 3.2, and 3.3 of MHA, which in this case, was the requirement to not foreclose on the First Trust while the loan modification was pending.

54.     Wells Fargo breached that duty by referring the First Trust to foreclosure while it was being considered for modification.

55.     At the time that Wells Fargo referred the First Trust to foreclosure, Amjad had not received a mortgage invoice/statement for over one year.

56.     CT, acting as agent for Wells Fargo and as the foreclosure trustee, had the same duty as Wells Fargo to adhere to the requirements of Chapter II, Section(s) 3.1, 3.2, and 3.3, and breached that duty by conducting a foreclosure sale while Amjad's application was awaiting final determination.

57.     As a result of the individual and combined breached by Wells Fargo and CT, the foreclosure sale was conducted in derogation of federal law, and Amjad wrongfully and unknowingly lost ownership of his Property to PNC.

**WHEREFORE**, the Plaintiffs, AMJAD H. KHAN, respectfully requests that this Court enter judgment against Wells Fargo and CT, jointly and severally, and award Plaintiffs money damages equal to the fair market value of the Property; award Plaintiffs punitive damages in the amount of $100,000.00, and award Plaintiffs their costs and attorney's fees incurred herein.

## IV. BREACH OF IMPARTIALITY – WOODS ROGERS PLC

58.     Plaintiff realleges and incorporates herein the allegations contained in

paragraphs 1-57 above.

59.     On or about May 9, 2006, Plaintiff executed a Credit Line Deed of Trust (hereinafter "Second Trust"), securing a note in the amount of $390,000.00, borrowed from Mercantile Potomac Bank, Mercantile-Safe Deposit and Trust Company. (A copy of which is appended hereto as "Exhibit F")

60.     PNC became the successor lender to the Second Trust and on or about April 11, 2013, appointed Woods as the Substitute Trustee under the Second Trust. (A copy of the Substitute Trustee Deed is appended hereto as "Exhibit G").

61.     On or about May, 2013, Amjad received notice from Woods that he was in arrears on his Second Trust payments.

62.     Woods entered into an agreement with Amjad to make a one-time payment to cure the deficiency.

63.     Amjad relied on the representations made by Woods, and subsequently paid over $11,000.00 to Woods on June 23, 2013, curing the deficiency on the Second Trust.

64.     Woods, thereafter, bid on Amjad's Property and acquired it for PNC at the foreclosure auction.

65.     "A trustee under a deed of trust is a fiduciary for both debtor and creditor and must act impartially between them; A trustee must not place himself in a position where his personal interest conflicts with the interests of those for whom he acts as fiduciary". <u>Whitlow v. Mountain Trust Bank, Va. 1974, 215 Va. 149, 207 S.E.2d 837</u>.

66.     Woods, as trustee under the Second Trust, had a duty to act impartially between PNC and Amjad.

67.    Woods breached that duty when it coerced Amjad into making a substantial payment on his Second Trust, and then shortly thereafter purchased Amjad's Property upon foreclosure of the First Trust, and then sued Amjad and his brother Anowar for possession.

68.    Woods, having received notice of foreclosure from Wells Fargo and CT, which notices contained factually incorrect information for the Property; and having recently received a substantial payment from Amjad to avoid default of the Second Trutst, knew *-or should have known-* that Amjad had not received notice of default or notice of foreclosure at the time it bid on the Property for PNC.

69.    Woods breached its duty to act impartially by entering into an Agreement with Amjad to cure the Second Trust deficiency, and then immediately and knowingly, or with reason to know, acquired the Property without Amjad having first received notice of foreclosure and an opportunity to cure.

**WHEREFORE,** the Plaintiff, AMJAD H. KHAN, respectfully requests that this Court enter judgment against Woods, and award Plaintiffs money damages equal to the fair market value of the Property; award Plaintiffs punitive damages in the amount of $100,000.00, and award Plaintiffs their costs and attorney's fees incurred herein.

## V. RESCISSION – WELLS FARGO AND PNC

70.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1-69 above.

71.    Prior to the foreclosure sale, Amjad was the record owner of the Property for over thirty years.

72.    Wells Fargo breached the terms of the First Trust and breached its

fiduciary duties, which resulted in an improper foreclosure sale, and a transfer of ownership of the Property to PNC.

73.     Rescission is an equitable remedy, and whether rescission is a proper remedy is within the sound discretion of the trial court. Bolling v. King Coal Theatres, Inc., 185 Va. 991, 996, 41 S.E.2d 59, 62 (1947).

74.     Further, § 55-59.2(E) of the 1950 Code of Virginia, as amended, provides that: "Failure to comply with the requirements for advertisement contained in this section shall, upon petition, render a sale of the property voidable by the court."

75.     Wells Fargo failed to comply with the requirements for advertisement contained in § 55-59.2, therefore, the sale of the Property is voidable by the court.

76.     Wells Fargo, individually and through its agent CT, failed to satisfy the conditions precedent to conducting a foreclosure sale: (1) failing to declare all debts immediately payable; (2) failing to send proper written notice of foreclosure; (3) and failing to properly advertise the foreclosure sale, therefore, the sale was improper.

77.     Further, Wells Fargo was precluded from foreclosing on the First Trust while Amjad's MHA consideration was pending final determination.

78.     PNC's acquisition of the Property was similarly improper, with Woods having breached its duty of impartiality.

79.     As a result of improper sale, Amjad lost ownership of his Property to PNC, and has incurred thousands of dollars in attorney's fees to maintain possession of his Property and to pursue this action.

80.     On information and belief and based upon representations made by PNC, PNC has not attempted to sell the Property, and does not have an intended third party

purchaser, therefore, rescission is an adequate, appropriate, and available remedy at law.

81.    A jury trial is requested.

**WHEREFORE,** Plaintiff, respectfully requests that this Honorable Court enter an Order setting aside the foreclosure sale as void, or in the alternative, award Plaintiff money damages equal to the fair market value of the Property; and award Plaintiff punitive damages in the amount of $100,000.00, and award Plaintiff his costs and reasonable attorney's fees incurred herein.

### VI. LACK OF STANDING – WELLS FARGO

81.    Plaintiff realleges and incorporates herein the allegations contained in paragraphs 1-80 above.

82.    Wells Fargo allegedly acquired the First Trust from World Savings and Loan Association, however, a trust assignment was never recorded among the land records of Fairfax County.

83.    15 U.S.C.A. § 77eee provides, in relevant part:

"(a) Information required
Subject to the provisions of section 77ddd of this title, a registration statement relating to a security shall include the following information and documents, as though such inclusion were required by the provisions of section 7 of the Securities Act of 1933 [15 U.S.C.A. § 77g]--
(1) such information and documents as the Commission may by rules and regulations prescribe in order to enable the Commission to determine whether any person designated to act as trustee under the indenture under which such security has been or is to be issued is eligible to act as such under subsection (a) of section 77jjj of this title; and
(2) an analysis of any provisions of such indenture with respect to (A) the definition of what shall constitute a default under such indenture, and the withholding of notice to the indenture security holders of any such default, (B) the authentication and delivery of the indenture securities and the application of the proceeds thereof, (C) the release or the release and substitution of any property subject to the lien of the indenture, (D) the satisfaction and discharge of the indenture, and (E) the evidence required to be furnished by the obligor upon the indenture securities to the trustee as to compliance with the conditions and covenants provided for in such indenture.
The information and documents required by paragraph (1) of this subsection with respect

to the person designated to act as indenture trustee shall be contained in a separate part of such registration statement, which part shall be signed by such person. Such part of the registration statement shall be deemed to be a document filed pursuant to this subchapter, and the provisions of sections 11, 12, 17, and 24 of the Securities Act of 1933 [15 U.S.C.A. §§ 77k,77*l*, 77q, 77x] shall not apply to statements therein or omissions therefrom."

84.    Wells Fargo has not produced the Promissory Note secured by the First Trust, and has not produced or recorded an assigned of trust, and therefore, may not have a valid interest in the First Trust or standing to foreclose on the First Trust.

85.    A trial by jury is requested.

**WHEREFORE,** Plaintiff, respectfully requests that this Honorable Court award the following relief for each count:

Count 1. Enter judgment against Wells Fargo and set aside the foreclosure sale as void, or in the alternative, award Plaintiff the fair market value of the Property, and his costs incurred herein.

Count 2. Enter judgment against Commonwealth Trustees LLC, and award Plaintiff the fair market value of the Property, punitive damages in the amount of $100,000.00, and costs incurred herein.

Count 3. Enter judgment against Wells Fargo and CT, jointly and severally, and award Plaintiffs money damages equal to the fair market value of the Property; award Plaintiffs punitive damages in the amount of $100,000.00, and award Plaintiffs their costs incurred herein.

Count 4. Enter judgment against Woods Rogers PLC, and award Plaintiffs money damages equal to the fair market value of the Property; award Plaintiffs punitive damages in the amount of $100,000.00, and award Plaintiffs their incurred herein.

Count 5. Enter judgment against Wells Fargo and PNC, and enter an order setting

aside the foreclosure sale as void, or in the alternative, award Plaintiff money

damages equal to the fair market value of the Property; order Wells Fargo to pay

punitive damages in the amount of $100,000.00, and award Plaintiff his costs

incurred herein.

Count 6. Enter an order setting aside the foreclosure sale as void, and restore all

parties to the status quo ante; and further order that Wells Fargo be enjoined from

enforcing the First Trust.

Respectfully Submitted,
**AMJAD H. KHAN**
By Counsel

**KEITHLEY LAW, PLLC**

Stephanie A. Laufer – V.S.B. No. 83103
Soo Kang Keithley – V.S.B. No. 44910
10560 Main Street, Suite 319
Fairfax, Virginia 22030
Telephone: (703) 865-7710
Facsimile: (703) 865-7706
Stephanie.Laufer@keithleylaw.com
Counsel for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July 2014, I mailed by first class mail, postage prepaid, a true copy of the foregoing to:

Mark D. Meyer
Sara Tussey
7910 Woodmont Ave., Suite 750
Bethesda, MD 20814
301-907-8000 (tel)
301-907-8101 (fax)
Counsel for Commonwealth Trustees, LLC

And

Amy S. Owen
John D. Ferman
BrigliaHundley, P.C.
3975 University Drive, Suite 100
Fairfax, VA 22030
703-883-9101 (tel)
703-942-8092 (fax)
Counsel for Wells Fargo Bank, N.A.

Stephanie A. Laufer

**EXHIBIT A**

91  113724          SEP -4   11: 16

BK7894  1135

RECORDING REQUESTED BY:
WORLD SAVINGS AND LOAN ASSOCIATION

WHEN RECORDED MAIL TO:
WORLD SAVINGS AND LOAN ASSOCIATION
A FEDERAL SAVINGS AND LOAN ASSOCIATION
2420 WEST 26TH AVENUE
DENVER, COLORADO 80211

ATTENTION: CENTRAL PROCESSING CENTER
DOCUMENTATION DEPARTMENT          FOR RECORDER'S USE ONLY

TAX MAP REFERENCE OR PARCEL ID NUMBERS: 060-2-36-0001

THIS IS A FIRST DEED OF TRUST.    LOAN NUMBER: 59-42324-4
THIS DEED OF TRUST SECURES A NOTE WHICH CONTAINS PROVISIONS
ALLOWING FOR CHANGES IN MY  INTEREST RATE, MONTHLY PAYMENTS
AND PRINCIPAL BALANCE.

EXEMPT FROM GRANTOR'S TAX
UNDER VA CODE § 58.1-811 C(1)

GRANTEE'S ADDRESS:
1901 HARRISON STREET
OAKLAND, CALIFORNIA 94612

THE MAXIMUM AGGREGATE PRINCIPAL SUM SECURED BY THIS DEED OF
TRUST IS $    230,625.00

I.    DEFINITIONS OF WORDS USED IN THIS DEED OF TRUST
      (A)   Security Instrument. This Deed of Trust, which is dated AUGUST 30,
1991, will be called the "Security Instrument."

      (B)   Borrower. AMJAD H. KHAN, AN UNMARRIED MAN

sometimes will be called "Borrower" and sometimes simply "I" or "me."

      (C)   Lender. WORLD SAVINGS AND LOAN ASSOCIATION, A FEDERAL SAVINGS
AND LOAN ASSOCIATION, will be called "Lender." Lender is a Federal Savings and Loan
Association which is organized and exists under the laws of the United States. Lender's
address is 1901 Harrison Street, Oakland, California 94612.

      (D)   Note. The note signed by Borrower and having the same date as this
Security Instrument will be called the "Note." The Note shows that I owe Lender
U.S.      $184,500.00 plus interest. I have promised to pay this debt in monthly
payments and to pay the debt in full by SEPTEMBER 01, 2021.

      (E)   Property. The property that is described below in Section III entitled
"Description of the Property" will be called the "Property."

      (F)   Sums Secured. The amounts described below in Section II entitled "Borrower's
Transfer of Rights in the Property" sometimes will be called the "Sums Secured."

      (G)   Person. Any person, organization, governmental authority or other party will be
called "Person."

      (H)   Trustor, Beneficiary, Trustee. Borrower is the "Trustor," Lender is the
"Beneficiary" and David N. Prensky, Arlington County, is the "Trustee."

II.    BORROWER'S TRANSFER OF RIGHTS IN THE PROPERTY
      I irrevocably grant and convey the Property to the Trustee, in trust for Lender, with
a power of sale subject to the terms of this Security Instrument. This means that, by
signing this Security Instrument, I am giving Lender and Trustee those rights that are stated
in this Security Instrument and also those rights that the law gives to lenders who hold
mortgages on real property. I am giving Lender and Trustee these rights to protect Lender
from possible losses that might result if I fail to:

BK 7894   1136

### EXHIBIT "A"

LOAN NO. 59-42324-4

All of Lot Numbered One (1) of the subdivision known  as Karen Knolls
being a resubdivision of Lots numbered Six (6) and Seven (7) and
parts of Lots numbered Ten (10) and Eleventh (11) Hickory Hall
Estates as duly dedicated, platted and recorded in Deed Book 2121 at
page 174 among the land records of Fairfax County, Virginia.

CF 120 (10.02.00) N20A
UNIVERSAL

ALL STATES

BK 7894  1137    59-42324-4

(i)  pay all amounts owed to Lender under the Note and all other notes secured by this Security Instrument, called the "Secured Notes," including future advances made by Lender and any changes to the Secured Notes made with the written consent of Lender;

(ii)  pay, with interest, any amounts that Lender spends under Paragraphs 2 and 7 below to protect the value of the Property and Lender's rights in the Property; and

(iii)  keep all of my other promises and agreements under this Security Instrument, the Secured Notes and any changes to the Secured Notes made with the written consent of Lender.

III.  DESCRIPTION OF THE PROPERTY
I give Trustee rights in the Property described below:

(i)  The property which is located at 3301 ROSE LANE, ANNANDALE, VA 22042. • • • • • • • • • • • • • • • • • • • • • The legal description of the Property is attached as Exhibit "A" which is made a part of this Security Instrument. This Property is called the "Described Property."

(ii)  All buildings and other improvements that are located on the Described Property;

(iii)  All rights in other property that I have as owner of the Described Property. These rights are known as easements, rights and appurtenances attached to the Property;

(iv)  All rents or royalties and other income from the Described Property;

(v)  All mineral, oil and gas rights and profits, water rights and stock that are part of the Described Property;

(vi)  All rights that I have in the land which lies in the streets or roads in front of, behind or next to, the Described Property;

(vii)  All fixtures that are now or in the future will be on the Described Property or on the property described in subsection (ii) of this Section;

(viii)  All of the rights and property described in subsections (ii) through (vii) of this Section that I acquire in the future;

(ix)  All replacements of or additions to the property described in subsections (ii) through (viii) of this Section; and

(x)  All of the amounts that I pay to Lender under Paragraph 2 below.

IV.  BORROWER'S RIGHT TO GRANT A SECURITY INTEREST IN THE PROPERTY AND BORROWER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY
I promise that:  (i) I lawfully own the Property;  (ii) I have the right to grant and convey the Property to Trustee; and (iii) there are no outstanding claims, charges, liens or encumbrances against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself and Trustee has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

### COVENANTS

I promise and I agree with Lender as follows:

**1.  BORROWER'S PROMISE TO PAY**
I will pay to Lender, on time, all principal and interest due under the Secured Notes and any prepayment and late charges due under the Secured Notes.

**2.  PAYMENTS FOR TAXES AND INSURANCE**
(A)  Borrower's Obligations
I will pay all amounts necessary to pay taxes and hazard insurance premiums on the Property as well as assessments, leasehold payments, ground rents or mortgage insurance premiums (if any).

**(B)   Impound/Escrow Accounts**

**(i)   Borrower's Obligations**
If Lender gives me written notice to do so, I will pay the amounts in Paragraph 2(A) above to Lender, unless the applicable law requires otherwise. I will make these payments on the same day that my monthly payments of principal and interest are due under the Secured Notes.

Each of my payments to Lender under this Paragraph 2 will be the sum of the following:

(a)   One-twelfth of the estimated yearly taxes and assessments on the Property which under the applicable law may be superior to this Security Instrument; plus

(b)   One-twelfth of the estimated yearly leasehold payments or ground rents on the Property, if any; plus

(c)   One-twelfth of the estimated yearly premium for hazard insurance covering the Property; plus

(d)   One-twelfth of the estimated yearly premium for mortgage insurance, if any.

I will give Lender all notices or bills that I receive for the amounts due under this Paragraph 2.

**(ii)   Lender's Obligations**
If I make my payments to Lender, Lender will estimate from time to time my yearly taxes, hazard insurance premiums, assessments, leasehold payments, ground rents and mortgage insurance premiums, which items will be called the "Impound/Escrow Items." Lender will use existing assessments and bills and reasonable estimates of future assessments and bills to estimate the Impound/Escrow Items. The amounts that I pay to Lender for Impound/Escrow Items under this Paragraph 2 will be called the "Funds."

Lender may hold the Funds. Except as described in this Paragraph 2, Lender will use the Funds to pay the Impound/Escrow Items. Lender will give to me, without charge, an annual statement of Funds activity.

Lender may not charge me for holding or keeping the Funds, for using the Funds to pay Impound/Escrow Items, for analyzing my payments of Funds, or for receiving, verifying and totaling assessments and bills. However, Lender may charge me for these services if Lender pays me interest on the Funds and if the law permits Lender to make such a charge. Lender will not be required to pay me any interest or earnings on the Funds unless either (a) Lender and I agree in writing, at the time I sign this Security Instrument, that Lender will pay interest on the Funds; or (b) the law requires Lender to pay interest on the Funds.

**(iii)   Adjustments to the Funds**
If Lender's estimates of the Impound/Escrow Items are too high, the amounts that I pay under this Paragraph 2 will be too large.

If an excess of Funds remains after all Impound/Escrow Items have been paid and if I am keeping all of my promises and agreements made in this Security Instrument, then I will have the right to have the excess amount refunded directly to me, if it exceeds $25.00, or credited to my future monthly payments of Funds. Any refund or credit to which I am entitled will be made once a year.

If, at the time payments of Impound/Escrow Items are due, Lender has not received enough Funds to make those payments, I will pay to Lender whatever additional amount is necessary to pay the Impound/Escrow Items in full. I must pay that additional amount in one or more payments as Lender may require.

When I have paid all of the amounts due under the Secured Notes and under this Security Instrument, Lender will promptly refund to me any Funds that are then being held by Lender. If, under Paragraph 28 below, Lender acquires the Property or the Property is sold, then immediately before the acquisition or sale, Lender will use any Funds which Lender is holding at that time to reduce the Sums Secured.

**3.    APPLICATION OF BORROWER'S PAYMENTS**
Unless the law requires otherwise, Lender will apply each of my payments under the Secured Notes and under Paragraphs 1 and 2 above in the following order and for the following purposes:

First, to pay late charges due under the Secured Notes;

Second, to pay prepayment charges due under the Secured Notes;

Third, to pay any advances due to Lender under this Security Instrument;

Fourth, to pay the amounts due to Lender under Paragraph 2 above;

Fifth, to pay interest due under the Secured Notes;

Sixth, to pay deferred interest under the Secured Notes;

Last, to pay principal due under the Secured Notes.

**4.    BORROWER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS**
I will pay all taxes, assessments and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument.

I will also make payments due under my lease if I am a tenant on the Property and I will pay ground rents (if any) due on the Property. I will pay these amounts either by making the payments to Lender that are described in Paragraph 2 above or by making the payments on time to the Person owed them.

Any claim, demand or charge that is made against property because an obligation has not been fulfilled is known as a lien. I will promptly pay or satisfy all liens against the Property that may be superior to this Security Instrument. However, this Security Instrument does not require me to satisfy a superior lien if: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves in writing the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that Person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give to me a notice identifying the superior lien. I will pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**5.    BORROWER'S OBLIGATION TO MAINTAIN INSURANCE**
At my sole cost and expense, I will obtain and maintain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. I may choose the insurance company but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable. All of these insurance policies and renewals of the policies must include what is known as a Standard Mortgage Clause to protect Lender. The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If I obtain earthquake insurance, any other hazard insurance, credit life and/or disability insurance, or any other insurance on or relating to the Property or the Secured Notes and which are not specifically required by Lender, I will name Lender as loss payee of any proceeds.

If there is a loss or damage to the Property, I will promptly notify the proper insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "Proceeds." Any Proceeds received will be applied first to reimburse Lender for costs and expenses incurred in connection with obtaining the Proceeds, and then, at Lender's option and in the order and proportion as Lender may determine in its sole and absolute discretion, regardless of any impairment or lack of impairment of security, as follows: (A) to the extent allowed by applicable law, to the Sums Secured in a manner that Lender determines and/or (B) to the

payment of costs and expenses of necessary repairs or to the restoration of the Property to a condition satisfactory to Lender, such application to be made in the manner and at the times as determined by Lender.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that the Insurance company has offered to settle a claim, Lender may collect the Proceeds. Lender may use the Proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any Proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my monthly payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

If Lender acquires the Property under Paragraph 28 below, all of my rights in the Insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

If I am required by Lender to pay premiums for mortgage insurance, I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

6.   BORROWER'S OBLIGATION TO MAINTAIN THE PROPERTY AND TO FULFILL ANY LEASE OBLIGATIONS
I will keep the Property in good repair. I will not destroy or substantially change the Property and I will not allow the Property to deteriorate. I will keep and maintain the Property in compliance with any state or federal hazardous materials and hazardous waste laws. I will not use, generate, manufacture or store any hazardous materials or hazardous waste on, under or about the Property. I will indemnify, defend and hold harmless Lender and its employees, officers and directors and their successors from any claims, damages or costs for required or necessary repair or the removal of hazardous waste or any other hazardous materials claim. If I do not own but am a tenant on the property, I will fulfill my obligations under my lease. I also agree that, if I acquire the fee title to the Property, my lease interest and the fee title will not merge unless Lender agrees to the merger in writing.

7.   LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY
If:   (A) I do not keep my promises and agreements made in this Security Instrument, or (B) someone, including me, begins a legal proceeding that may significantly affect Lender's rights in the Property (such as a legal proceeding in bankruptcy, in probate, for condemnation or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the Lender's rights in the Property. Lender's actions may include appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Lender must give me notice before Lender may take any of these actions. Although Lender may take action under this Paragraph 7, Lender does not have to do so. Any action taken by Lender under this Paragraph 7, will not release me from my obligations under this Security Instrument.

I will pay to Lender any amounts which Lender advances under this Paragraph 7 with interest, at the interest rate in effect under the Secured Notes which have not been paid. I will pay those amounts to Lender when Lender sends me a notice requesting that I do so. Interest on each amount will begin to accrue on the date that the amount is advanced by Lender. However, Lender and I may agree in writing to terms that are different from those in this Paragraph 7. This Security Instrument will protect Lender in case I do not keep this promise to pay those amounts with interest.

8.   LENDER'S RIGHT TO INSPECT THE PROPERTY
Lender, and others authorized by Lender, may enter upon and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

9.   AGREEMENTS ABOUT GOVERNMENTAL TAKING OF THE PROPERTY
I assign to Lender all my rights: (A) to proceeds of all awards or claims for damages resulting from condemnation, eminent domain or other governmental taking of all or any part of the Property; and (B) to proceeds from a sale of all or any part of the

BK 7894  1141        59-42324-4

Property that is made to avoid condemnation, eminent domain or other government taking of the property. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property or if I do not answer, within 30 days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which I owe to Lender under the Secured Notes, that use will not delay the due date or change the amount of any of my monthly payments under the Secured Notes and under Paragraphs 1 and 2 above. However, Lender and I may agree in writing to delays or changes.

**10.    CONTINUATION OF BORROWER'S OBLIGATIONS AND OF LENDER'S RIGHTS**
        **(A)    Borrower's Obligations**
                Lender may allow a Person who takes over my rights and obligations subject to this Security Instrument to delay or to change the amount of the monthly payments of principal and interest due under the Secured Notes or under this Security Instrument. Even if Lender does this, however, that Person and I will both still be fully obligated under the Secured Notes and under this Security Instrument.

Lender may allow those delays or changes for a Person who takes over my rights and obligations, even if Lender is requested not to do so. Lender will not be required to bring a lawsuit against such a Person for not fulfilling obligations under the Secured Notes or under this Security Instrument, even if Lender is requested to do so.

        **(B)    Lender's Rights**
                Even if Lender does not exercise or enforce any of its rights under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against my Property, Lender will have the right under Paragraph 28 below to demand that I make immediate payment in full of the amounts that I owe to Lender under the Note and under this Security Instrument.

**11.    OBLIGATIONS OF BORROWER AND OF PERSONS TAKING OVER BORROWER'S RIGHTS OR OBLIGATIONS**
        Any Person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any Person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one Person signs this Security Instrument as Borrower, each of us is fully obligated to keep all of Borrower's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together. This means that any one of us may be required to pay all of the Sums Secured.

**12.    MAXIMUM LOAN CHARGES**
        If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed permitted limits, then: (A) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limits and (B) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Secured Notes or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Secured Notes.

BK 7894  1142

59-42324-4

13.   **LEGISLATION AFFECTING LENDER'S RIGHTS**
If a change in applicable law would make any provision of the Secured Notes or this Security Instrument unenforceable, Lender may require that I make immediate payment in full of all Sums Secured by this Security Instrument.

14.   **NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT**
Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice will be addressed to me at 3301 ROSE LANE, ANNANDALE, VA 22042. • • • • • • • • • • • • • • • • • • •   A notice will be given to me at an alternative address if I give Lender a notice of my alternative address. I may designate only one mailing address at a time for notification purposes. Any notice that must be given to Lender under this Security Instrument will be given by mailing it by first class mail to Lender's address stated in Section I(C) above entitled, "Definitions of Words Used in This Deed of Trust," unless Lender gives me notice of a different address. Any notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph 14 or of applicable law.

15.   **GOVERNING LAW; SEVERABILITY**
This Security Instrument and the Secured Notes shall be governed by and construed under federal law and federal rules and regulations including those for federal savings and loan associations, called "Federal Law." In the event that any of the terms or provisions of this Security Instrument or the Secured Notes are interpreted or construed by a court of competent jurisdiction to be void, invalid or unenforceable, such decision shall affect only those provisions so construed or interpreted and shall not affect the remaining provisions of this Security Instrument or the Secured Notes.

16.   **BORROWER'S COPY**
I acknowledge the receipt of one conformed copy of the Secured Notes and of this Security Instrument.

17.   **LENDER'S RIGHTS TO RENTAL PAYMENTS AND TO TAKE POSSESSION OF THE PROPERTY**
If Lender requires immediate payment in full or if I abandon the Property, then Lender, persons authorized by Lender, or a receiver appointed by a court at Lender's request may:  (A) collect the rental payments, including overdue rental payments, directly from the tenants; (B) enter upon and take possession of the Property; (C) manage the Property; and (D) sign, cancel and change rental agreements and leases. If Lender notifies the tenants that Lender has the right to collect rental payments directly from them under this Paragraph 17, I agree that the tenants may make those rental payments to Lender without having to ask (i) Lender whether I have failed to keep my promises and agreements under this Security Instrument, or (ii) me for my permission to do so.

If Lender acts to have the Property sold after a Breach of Duty as defined in Paragraph 28, I understand and agree that:  (A) my right to occupy the Property ceases at the time the Property is sold; (B) I shall have no right to occupy the Property after such sale without the written consent of the new owner of the Property; and (C) my wrongful and unlawful possession of the Property may subject me to monetary damages, including the loss of reasonable rent and the cost of eviction. All rental payments collected by Lender or by a receiver, other than the rent paid by me under this Paragraph 17, will be used first to pay the costs of collecting rental payments and of managing the Property. If any part of the rental payments remains after those costs have been paid in full, the remaining part will be used to reduce the Sums Secured. The costs of managing the Property may include the receiver's fees, reasonable attorneys' fees and the costs of any necessary bonds.

18.   **INJURY TO PROPERTY; ASSIGNMENT OF RIGHTS**
An assignment is a transfer of rights to another. I may have rights to bring legal action against persons, other than Lender, for injury or damage to the Property or in connection with the loan made to me by Lender and which arose or will arise before or after the date of this Security Instrument. These rights to bring legal action may include an action for breach of contract, fraud, concealment of a material fact or for intentional or negligent acts. I assign these rights, and any proceeds arising from these rights, as permitted by applicable law, to Lender. Lender may, at its option, enforce these rights in its own name and may apply any proceeds resulting from this assignment to any amount that I may owe to Lender under the Note and this Security Instrument after deducting any expenses, including attorneys' fees, incurred in enforcing these rights. At the request of Lender, I will sign any further assignments or other documents that may be necessary to enforce this assignment.

**19.   CLERICAL ERRORS**
In the event Lender at any time discovers that this Security Instrument, the Secured Notes or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical mistake, calculation error, computer error or similar error, I agree, upon notice from Lender, to reexecute any Loan Documents that are necessary to correct any such error(s) and I also agree that I will not hold Lender responsible for any damage to me which may result from any such error.

**20.   LOST, STOLEN OR MUTILATED DOCUMENTS**
If any of the Loan Documents are lost, stolen, mutilated or destroyed and Lender delivers to me an indemnification in my favor, signed by Lender, then I will sign and deliver to Lender a Loan Document identical in form and content which will have the effect of the original for all purposes.

**21.   WAIVER OF STATUTE OF LIMITATIONS**
I will waive, within applicable law, the pleading of the statute of limitations as a defense to enforce this Security Instrument, including any obligations referred to in this Security Instrument or Secured Notes.

**22.   CAPTIONS**
The captions and headings at the beginning of each paragraph of this Security Instrument are for reference only and will not be used in the interpretation of any provision of this Security Instrument.

**23.   MODIFICATION**
This Security Instrument may be modified or amended only by an agreement in writing signed by Borrower and Lender.

**24.   CONDOMINIUM, COOPERATIVE AND PLANNED UNIT DEVELOPMENT OBLIGATIONS**
If the Property is a unit in a condominium, cooperative or planned unit development, each of which shall be called the "Project," and I have an interest in the common elements of the Project, then Lender and I agree that:

(A)   If an owners association or other entity, called "Owners Association," holds title to Property for the benefit or use of the Project and its members or shareholders, the Property also includes my interest in the Owners Association and the uses, proceeds and benefits of my interest.

(B)   The following are called the "Constituent Documents:" (i) The declaration or any other document which created the Project; (ii) By-laws of the Owners Association; (iii) Code of regulations for the Project; (iv) Articles of incorporation, trust instrument or equivalent document which creates the Owners Association; (v) The Project's covenants, conditions and restrictions; (vi) Other equivalent documents.

I shall perform all of my obligations under the Constituent Documents, including my obligation to pay, when due, all dues and assessments. If I do not pay the dues and assessments when due, Lender may, at its option, pay them. I will pay to Lender any amounts which Lender advances under this Paragraph 24 according to the terms described in Paragraph 7 above.

(C)   If the Owners Association maintains, with an insurance company reasonably acceptable to Lender, a master or blanket policy on the Project which is satisfactory to Lender and which provides insurance coverage on the terms, in the amounts, for the periods, and against the hazards Lender requires, including fire and hazards included within the term "extended coverage," and Lender is provided with evidence of such master or blanket policy, then: (i) Lender waives the provision in Paragraph 2(B) above for the monthly payment to Lender of one-twelfth of the estimated yearly premium installments for hazard insurance on the Property; and (ii) hazard insurance coverage on the Property as required by Paragraph 5 above is deemed to be satisfied to the extent that the required coverage is provided by the Owners Association policy. I shall give Lender prompt notice of any lapse in the required hazard insurance coverage. I shall provide a copy of such master or blanket policy to Lender annually.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, whether to the unit or to common elements, any proceeds payable to me are hereby assigned and shall be paid to Lender for application to the Sums Secured by this Security Instrument, with any excess paid to me.

BK7894 1144                59-42324-4

I shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable to Lender in form, amount and extent of coverage.

(D)  I shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the Project, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of condemnation, eminent domain or other governmental taking; (ii) any amendment to any provision of Constituent Documents unless the provision is for the express benefit of Lender or of lenders generally; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the master or blanket hazard insurance policy and/or the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

25.  FUTURE ADVANCES
At Borrower's request, Lender, at its option (but before release of this Security Instrument or the full reconveyance of the Property described in the Security Instrument) may lend future advances to Borrower. Such loan will then be additional Sums Secured under this Security Instrument.

26.  AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED
Acceleration of Payment of Sums Secured. Lender may, at its option, require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, is sold or transferred without Lender's prior written permission. Lender also may, at its option, require immediate payment in full if Borrower is not a natural Person and a beneficial interest in Borrower is sold or transferred without Lender's prior written permission. However, Lender shall not require immediate payment in full if this is prohibited by Federal Law in effect on the date of the Security Instrument.

If Lender exercises the option to require immediate payment in full, Lender will give me notice of acceleration. If I fail to pay all Sums Secured by this Security Instrument immediately, Lender may then or thereafter invoke any remedies permitted by this Security Instrument without further notice to or demand on me.

EXCEPTION TO ACCELERATION OF PAYMENT OF SUMS SECURED.  IF THE SALE OR TRANSFER OF ALL OR ANY PART OF THE PROPERTY, OR OF A BENEFICIAL INTEREST IN BORROWER, IF BORROWER IS NOT A NATURAL PERSON, IS THE FIRST ONE TO OCCUR AFTER THE DATE OF THIS SECURITY INSTRUMENT, THE LENDER WILL NOT EXERCISE THE OPTION TO ACCELERATE PAYMENT IN FULL OF ALL SUMS SECURED AND THE LOAN MAY BE ASSUMED IF:

(I)  LENDER RECEIVES A COMPLETED WRITTEN APPLICATION FROM TRANSFEREE TO EVALUATE THE CREDITWORTHINESS OF TRANSFEREE AS IF A NEW LOAN WERE BEING MADE TO THE TRANSFEREE BY LENDER;
(II)  LENDER APPROVES THE CREDITWORTHINESS OF THE TRANSFEREE IN WRITING;
(III)  AN ASSUMPTION FEE, IN AN AMOUNT TO BE DETERMINED BY LENDER (BUT NOT TO EXCEED 1% OF THE BALANCE OF PRINCIPAL AND INTEREST DUE UNDER THE SECURED NOTES AT THE TIME OF SALE OR TRANSFER OF THE PROPERTY OR OF THE INTEREST IN THE BORROWER) IS PAID TO LENDER; AND
(IV)  THE TRANSFEREE EXECUTES AN ASSUMPTION AGREEMENT WHICH IS SATISFACTORY TO LENDER.

THE LOAN MAY BE ASSUMED UNDER ITS THEN EXISTING TERMS AND CONDITIONS WITH ONE EXCEPTION; THE LIFETIME RATE CAP MAY BE CHANGED.  THE LIFETIME RATE CAP SHALL BE CHANGED TO AN INTEREST RATE WHICH IS THE SUM OF THE INTEREST RATE IN EFFECT ON THE DATE OF A SALE OR TRANSFER OF THE PROPERTY OR OF THE BENEFICIAL INTEREST IN BORROWER PLUS 5 PERCENTAGE POINTS, IF THAT SUM EXCEEDS THE LIFETIME RATE CAP STATED IN THE SECURED NOTES.

BK 7894  1145          59-42324-4

**27.   SUBSTITUTION OF TRUSTEE**
I agree that (1) Lender may at any time appoint a successor trustee and (2) that Person shall become the Trustee under this Security Instrument as if originally named as Trustee.

**28.   RIGHTS OF THE LENDER IF THERE IS A BREACH OF DUTY**
It will be called a "Breach of Duty" if (i) I do not pay the full amount of each monthly payment on the date it is due; or (ii) I fail to perform any of my promises or agreements under the Note or this Security Instrument; or (iii) any statement made in my application for this loan was materially false or misleading or if any statement in my application for this loan was materially false or misleading by reason of my omission of certain facts; or (iv) I have made any other statement to Lender in connection with this loan that is materially false or misleading. If there is a Breach of Duty by me, Lender may demand an immediate payment of all sums secured.

If there is a Breach of Duty by me, Lender may take action to have the Property sold under any applicable Federal Law, rule or regulation and, where Federal Law is not applicable, under the law of the state where the Property is located, which will be called the "Applicable Law."

Lender does not have to give me notice of a Breach of Duty unless notice is required by Applicable Law. If Lender does not make a demand for full payment upon a Breach of Duty, Lender may make a demand for full payment upon any other Breach of Duty.

If there is a Breach of Duty, Lender may also take action to have a receiver appointed under the Applicable Law to collect rents from any tenants on the Property and to manage the Property. The action to appoint a receiver may be taken without prior notice to me and regardless of the value of the Property.

Trustee shall give public notice of sale by advertising, in accordance with applicable law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or any different form of advertisement Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale.

The sale of the Property may be postponed by or at the direction of Lender except as limited or prohibited by the Applicable Law. If the Property is sold under the Applicable Law, I agree that it may be sold in one or more parcels. I also agree that Lender may add to the amount that I owe to Lender all legal fees, costs, allowances, and disbursements incurred as a result of the action to sell the Property, except to the extent that the Applicable Law limits or prohibits any such charges.

Lender will apply the proceeds from the sale of the Property in the following order: (A) to all fees, expenses and costs incurred in connection with the sale, including trustees' and attorneys' fees, if any; (B) to all Sums Secured by this Security Instrument; and (C) any excess to the Person or Persons legally entitled to it.

**29.   RELEASE OF THIS SECURITY INSTRUMENT**
When Lender has been paid all of the amounts due under the Secured Notes and under this Security Instrument, Lender will authorize Trustee to release this Security Instrument and the Secured Notes. Borrower will pay all costs incurred by Lender or Trustee relating to the delivery of the Secured Notes and this Security Instrument, the release and its recordation to the extent allowed by law, plus a Trustee's fee in the amount as Trustee then charges by custom.

**30.   STATEMENT OF OBLIGATION**
To the extent allowed by law, I will give Lender a fee for furnishing any statement of obligation with respect to this Security Instrument or the Secured Notes.

BK 7894  1146          59-42324-4

31.   **WAIVER OF REDEMPTION**
My right of redemption is waived to the extent allowed by applicable law.

32.   **QUICK QUALIFYING LOAN PROGRAM**
I have qualified for this loan by making statements of fact which were relied upon by Lender to approve the loan rapidly. This loan is called a "Quick Qualifying Loan." I have stated and I confirm that:   (A) I do not have any other Quick Qualifying Loans with Lender; (B) I have agreed to not further encumber the Property and do not intend to further encumber the Property for at least six months after the date of the Secured Notes and this Security Instrument; and (C) if I am purchasing the Property, all of the terms of the purchase agreement submitted to Lender are true and the entire down payment is cash from my own funds.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin subject to the Lifetime Rate Cap stated in the Secured Notes.

33.   **OWNER OCCUPANCY**
Lender has relied upon statements of fact which I have made to qualify for this loan. I have stated and confirm that:   (A) the Property is my personal and primary residence; (B) I will occupy the Property not later than 30 days after this Security Instrument is recorded; and (C) I will use the Property as my residence for at least 12 months from the date this Security Instrument is recorded.

If any of the statements of fact that I have made are materially false or misleading, I will be in default under the Secured Notes and this Security Instrument. If I am in such default, Lender may, at its option, increase the interest rate and margin, subject to the Lifetime Rate Cap stated in the Secured Notes.

**THIS SPACE INTENTIONALLY LEFT BLANK; SIGNATURE PAGE FOLLOWS.**

BK7894 1147

59-42324-4

NOTICE:   THE DEBT SECURED BY THIS SECURITY INSTRUMENT IS SUBJECT TO CALL IN FULL OR THE TERMS MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY BEING CONVEYED.

BY SIGNING BELOW, I accept and agree to the promises and agreements contained in this Security Instrument and in any rider(s) signed by me and recorded in proper official records.

(SIGN YOUR NAME EXACTLY AS IT APPEARS BELOW)

BORROWER(S):

_____ (Seal)
AMJAD H. KHAN

_____ (Seal)

_____ (Seal)

_____ (Seal)

_____ (Seal)

_____ (Seal)

ATTACH INDIVIDUAL  NOTARY ACKNOWLEDGEMENT

COMMONWEALTH OF VIRGINIA:
COUNTY OF FAIRFAX, to-wit:

Given under my hand and seal this 30th day of August, 1991.

_____
Notary Public

My commission expires: _____
My Commission Expires December 8, 1992

SEP -4 91

Page 12 of 12
RECORDED FAIRFAX CO VA
TESTE:
Cl FRX

VA

**EXHIBIT B**

Fairfax County Circuit Court, CPAN Cover Sheet v2.0                    Page 1 of 1

# Fairfax County Circuit Court
# CPAN Cover Sheet v2.0

**Instruments**
   SUBSTITUTE TRUSTEE

**Grantor(s)**
   WELLS FARGO BANK NA_F_N, KHAN, AMJAD H_F_N

**Grantee(s)**
   COMMONWEALTH TRUSTEES_F_T

| Consideration | | | Consideration % | 100 | |
|---|---|---|---|---|---|
| Tax Exemption | | | Amount Not Taxed | | |
| DEM Number | | | Tax Map Number | 060-2- -36- -0001- | |
| Original Book | 7894 | | Original Page | 1135 | |
| Title Company | | | | Title Case | |
| Property Descr. | | | | | |
| Certified | No | Copies | 0 | Page Range | |



RECORDING REQUESTED BY:
SanA-Wells Fargo Bank, N.A.
4101 Wiseman Blvd.
San Antonio, TX 78251
Tax ID# 060-2-36-0001

## APPOINTMENT OF SUCCESSOR TRUSTEE

Pursuant to the provisions of that certain Deed of Trust executed on August 30, 1991 by Amjad H. Khan, an Unmarried Man as Trustor, to David N. Prensky, Arlington County, as Trustee, for the benefit of World Savings and Loan Association, A Federal Savings and Loan Association as Beneficiary, recorded on September 4, 1991, as Instrument No. N/A, in book 7894, page 1135, in the office of the County Recorder of Fairfax County, VA; and to secure an obligation under a Promissory Note in the amount of $184,500.00;

The undersigned, as present holder of the Note, does hereby remove David N. Prensky, Arlington County, as Trustee and does, pursuant to the terms of the Deed of Trust, hereby remove any Substitute Trustee or Trustees who may have been previously appointed in place of the original Trustee, and does hereby appoint and substitute Commonwealth Trustees, LLC of 8601 Westwood Center Drive, Suite 255, Vienna, VA 22182 to serve, effective immediately, as Substitute Trustee in the Deed of Trust, and to replace David N. Prensky, Arlington County.

The undersigned hereby revokes all other substitutions of trustee which it may have executed, appointed or filed in the past, giving and granting to said Substitute Trustee all the powers, duties and authority of the discharged Trustee, and hereby ratifying all acts of said Substitute Trustee heretofore or hereafter performed.  Said Substitute Trustee shall, in accordance with the provisions of the deed of trust, succeed to all the title, powers and duties conferred upon the Original Trustee(s) by the terms of said deed of trust and by applicable law.

The following described real estate, together with its improvements, easements and appurtenances thereunto belonging, is located in Fairfax County, VA and more particularly described as follows:

**All of Lot Numbered One (1) of the subdivision known as Karen Knolls being a resubdivision of Lots numbered Six (6) and Seven (7) and parts of Lots numbered Ten (10) and Eleventh (11) Hickory Hall Estates as duly dedicated, platted and recorded in Deed Book 2121 at page 174 among the land records of Fairfax County, Virginia.**

At the time of the execution of the Deed of Trust, this property was reported to have an address of: 3301 Rose Lane, Annandale, VA 22042.

COMMONWEALTH
TRUSTEES, LLC
8601 WESTWOOD
CENTER DRIVE
SUITE 255
VIENNA, VIRGINIA
22182
703-752-8500
FILE NUMBER: 30821

PROJECT NAME:
KHAN, AMJAD H.
PROPERTY ADDRESS:
3301 ROSE LANE

1

In witness whereof, the undersigned holder of the Note has executed this document. If the undersigned is a corporation, it has caused its name to be signed and its seal, if any, affixed by an officer or other person duly authorized to do so by order of its board of directors.

Dated: June 3, 2013

Wells Fargo Bank, N.A.

By: _____

Elizabeth A Ortega - Vice President Loan Documentation

Name: Elizabeth A Ortega
Title: Vice President Loan Documentation
Company: Wells Fargo Bank, N.A.
Date: 06/03/2013

State of Texas
County of Bexar

This instrument was acknowledged before me on June 3, 2013 by Elizabeth A Ortega, Vice President Loan Documentation of Wells Fargo Bank, N.A., a federally chartered bank, on behalf of said bank.

Notary Public

CHRISTY JENKINS
Notary Public, State of Texas
My Commission Expires
June 17, 2013

COMMONWEALTH
TRUSTEES, LLC
8601 WESTWOOD
CENTER DRIVE
SUITE 255
VIENNA, VIRGINIA
22182
703-752-8500
FILE NUMBER: 30II21

PROJECT NAME :
KHAN, AMJAD H.
PROPERTY ADDRESS:
3301 ROSE LANE

When Recorded Return To:
Commonwealth Trustees, LLC
8601 Westwood Center Drive, Suite 255
Vienna, VA 22182

2

06/14/2013
RECORDED FAIRFAX CO VA
TESTE:

# Commonwealth Trustees, LLC

8601 Westwood Center Drive, Suite 255
Vienna, Virginia 22182
Phone: 703-752-8500
Fax: 703-752-4300

July 8, 2013

Amjad H. Khan
3301 Rose Lane
Annandale, VA 22042

    Re:    **Amjad H. Khan**
             **3301 Rose Lane**
             **Annandale, VA 22042**
             **Tax ID: 060-2-36-0001**
             **Our File Number: 30821**

Dear Amjad H. Khan:

Pursuant to Section 55-59.1 of the 1950 Code of Virginia, as amended, please be advised that the appointed Substitute Trustee will sell at public auction the above referenced property on July 25, 2013 at 1:00 PM.

The sale will be conducted at the front of the entrance to the new Fairfax County Courthouse located at 4110 Chain Bridge Road, Fairfax, VA 22030, as specified in the enclosed advertisement. Enclosed please find a copy of the advertisement of sale as published in The Washington Post which contains the terms of sale and a copy of the executed Substitution of Trustee.

                        Sincerely,

                        Commonwealth Trustees, LLC

Via certified mail, return receipt requested and first class mail.

Enclosures

EXHIBIT

exhibit

B

# Commonwealth Trustees, LLC

8601 Westwood Center Drive, Suite 255
Vienna, Virginia 22182
Phone: 703-752-8500
Fax: 703-752-4300

July 8, 2013

Amjad H. Khan
7803 Belle Point Drive
Greenbelt, MD 20770

Re:   **Amjad H. Khan**
**3301 Rose Lane**
**Annandale, VA 22042**
**Tax ID: 060-2-36-0001**
**Our File Number: 30821**

Dear Amjad H. Khan:

Pursuant to Section 55-59.1 of the 1950 Code of Virginia, as amended, please be advised that the appointed Substitute Trustee will sell at public auction the above referenced property on July 25, 2013 at 1:00 PM.

The sale will be conducted at the front of the entrance to the new Fairfax County Courthouse located at 4110 Chain Bridge Road, Fairfax, VA 22030, as specified in the enclosed advertisement. Enclosed please find a copy of the advertisement of sale as published in The Washington Post which contains the terms of sale and a copy of the executed Substitution of Trustee.

Sincerely,

Commonwealth Trustees, LLC

Via certified mail, return receipt requested and first class mail.

Enclosures

# Commonwealth Trustees, LLC

8601 Westwood Center Drive, Suite 255
Vienna, Virginia 22182
Phone: 703-752-8500
Fax: 703-752-4300

July 8, 2013

Amjad H. Khan
3301 Rose Lane
Falls Church, VA 22042

> Re: **Amjad H. Khan**
> **3301 Rose Lane**
> **Annandale, VA 22042**
> **Tax ID: 060-2-36-0001**
> **Our File Number: 30821**

Dear Amjad H. Khan:

Pursuant to Section 55-59.1 of the 1950 Code of Virginia, as amended, please be advised that the appointed Substitute Trustee will sell at public auction the above referenced property on July 25, 2013 at 1:00 PM.

The sale will be conducted at the front of the entrance to the new Fairfax County Courthouse located at 4110 Chain Bridge Road, Fairfax, VA 22030, as specified in the enclosed advertisement. Enclosed please find a copy of the advertisement of sale as published in The Washington Post which contains the terms of sale and a copy of the executed Substitution of Trustee.

Sincerely,

Commonwealth Trustees, LLC

Via certified mail, return receipt requested and first class mail.

Enclosures

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |

Amjad H. Khan
3301 Rose Lane
Annandale, VA 22042

30821 / WELLS / Khan, Amjad H.

7013 0600 0001 2416 7402

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |

TMJ Management Services, Inc.
113 Rowell Court
Falls Church, VA 22046

30821 / WELLS / Khan, Amjad H.

7013 0600 0001 2416 7280

---

**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

| | | |
|---|---|---|
| Postage | $ | |
| Certified Fee | | |
| Return Receipt Fee (Endorsement Required) | | Postmark Here |
| Restricted Delivery Fee (Endorsement Required) | | |

Zahid Chaudry
616 N. Washington Street
Alexandria, VA 22314

30821 / WELLS / Khan, Amjad H.

7013 0600 0001 2416 7273

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7419

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

Iqbal Husain
6482 Ohara Court
Springfield, Va 22152

30821 / WELLS / Khan, Amjad H.

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7297

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

Suburban Bank of Maryland
7505 Greenway Center Dr
Greenbelt, MD 20878

30821 / WELLS / Khan, Amjad H.

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7389

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

Amjad H. Khan
7803 Belle Point Drive
Greenbelt, MD 20770

30821 / WELLS / Khan, Amjad H.

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7396

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

Amjad H. Khan
3301 Rose Lane
Falls Church, VA 22042

30821 / WELLS / Khan, Amjad H.

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7365

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

All Occupants
3301 Rose Lane
Annandale, VA 22042

30821 / WELLS / Khan, Amjad H.

---

**U.S. Postal Service**
**CERTIFIED MAIL RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com

OFFICIAL USE

7013 2416 0001 0600 7372

| | |
|---|---|
| Postage | $ |
| Certified Fee | |
| Return Receipt Fee (Endorsement Required) | |
| Restricted Delivery Fee (Endorsement Required) | |

Postmark Here

Anwar Khan
2623 Nicholson Street
Apt 104
Hyattsville, MD 20782

30821 / WELLS / Khan, Amjad H.

See Reverse for Instructions



ONWEALTH TRUSTEES, LLC
stwood Center Drive, Suite 255
VA 22182



7013 0600 0001 2416 7389

Amjad H. Khan
7803 Belle Point Drive
Greenbelt, MD 20770

30821 / WELLS / Khan, Amjad H.



MONWEALTH TRUSTEES, LLC
Westwood Center Drive, Suite 255
na, VA 22182



7013 0600 0001 2416 7365

All Occupants
3301 Rose Lane
Annandale, VA 22042

30821 / WELLS / Khan, Amjad H.



ONWEALTH TRUSTEES, LLC
estwood Center Drive, Suite 255
VA 22182



7013 0600 0001 2416 7341

Chase Bank
948 Clopper Rd #2
Gaithersburg, MD 20878

30821 / WELLS / Khan, Amjad H.

ONWEALTH TRUSTEES, LLC
estwood Center Drive, Suite 255
VA 22182





7013 0600 0001 2416 7419

02 1P          $ 006.11⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Iqbal Husain
6482 Ohara Court
Springfield, Va 22152

30821 / WELLS / Khan, Amjad H.

---

MONWEALTH TRUSTEES, LLC
Westwood Center Drive, Suite 255
a, VA 22182





7013 0600 0001 2416 7402

02 1P          $ 006.11⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Amjad H. Khan
3301 Rose Lane
Annandale, VA 22042

30821 / WELLS / Khan, Amjad H.

---

COMMONWEALTH TRUSTEES, LLC
3601 Westwood Center Drive, Suite 255
Vienna, VA 22182





7013 0600 0001 2416 7396

02 1P          $ 006.11⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Amjad H. Khan
3301 Rose Lane
Falls Church, VA 22042

IONWEALTH TRUSTEES, LLC
Westwood Center Drive, Suite 255
a, VA 22162



02  1P          $ 000.46⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Amjad H. Khan
7803 Belle Point Drive
Greenbelt, MD 20770

30821 / WELLS / Khan, Amjad H.

---

COMMONWEALTH TRUSTEES, LLC
8601 Westwood Center Drive, Suite 255
Vienna, VA 22182

02  1P          $ 000.46⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Amjad H. Khan
3301 Rose Lane
Falls Church, VA 22042

30821 / WELLS / Khan, Amjad H.

---

ALTH TRUSTEES, LLC
...nd Center Drive, Suite 255
, VA 22182



02  1P          $ 000.46⁰
0001737090   JUL 08 2013
MAILED FROM ZIP CODE 20814

Amjad H. Khan
3301 Rose Lane
Annandale, VA 22042

**EXHIBIT D**



English   ⌄   Customer Service   USPS Mob..                    Register / Sign In   ⌄

# USPS

Search USPS.com or Track Packages   🔍

# USPS Tracking™

Customer Service ›
**Have questions? We're here to help.**

Tracking Number: **70130600000124167365**

Product & Tracking Information                    Available Actions

**Postal Product:**                    **Features:**
                                       Certified Mail™

| | | |
|---|---|---|
| **August 5, 2013 , 2:20 pm** | Delivered | **VIENNA, VA 22182** |

| | | |
|---|---|---|
| **August 4, 2013 , 6:08 am** | **Processed through USPS Sort Facility** | **MERRIFIELD, VA 22081** |
| **August 3, 2013 , 7:51 pm** | **Processed through USPS Sort Facility** | **CAPITOL HEIGHTS, MD 20790** |
| **August 2, 2013 , 10:57 pm** | **Depart USPS Sort Facility** | **CAPITOL HEIGHTS, MD 20790** |
| **August 2, 2013 , 9:19 pm** | **Processed through USPS Sort Facility** | **CAPITOL HEIGHTS, MD 20790** |
| **July 30, 2013 , 2:29 pm** | **Unclaimed** | **FALLS CHURCH, VA 22042** |
| **July 11, 2013 , 6:33 am** | **Arrival at Unit** | **FALLS CHURCH, VA 22042** |
| **July 11, 2013 , 3:21 am** | **Depart USPS Sort Facility** | **MERRIFIELD, VA 22081** |
| **July 11, 2013 , 2:26 am** | **Processed through USPS Sort Facility** | **MERRIFIELD, VA 22081** |
| **July 10, 2013 , 3:19 pm** | **Processed through USPS Sort Facility** | **MERRIFIELD, VA 22081** |
| **July 9, 2013 , 7:37 pm** | **Depart USPS Sort Facility** | **GAITHERSBURG, MD 20898** |
| **July 9, 2013 , 4:15 pm** | **Processed through USPS Sort Facility** | **GAITHERSBURG, MD 20898** |

# Track Another Package

**What's your tracking (or receipt) number?**

Track It



⊕ English  ⌄    ⊕ Customer Service    ⊟ USPS Mobi..                                    🔒 Register / Sign In  ⌄

Search USPS.com or Track Packages    🔍

# USPS Tracking™

Customer Service ›
Have questions? We're here to help.

**Tracking Number: 70130600000124167396**

DELIVERED

## Product & Tracking Information

Available Actions

| Postal Product: | Features: Certified Mail™ | |
|---|---|---|

| August 5, 2013 , 2:20 pm | Delivered | VIENNA, VA 22182 |

| August 4, 2013 , 6:08 am | Processed through USPS Sort Facility | MERRIFIELD, VA 22081 |
| August 3, 2013 , 7:51 pm | Processed through USPS Sort Facility | CAPITOL HEIGHTS, MD 20790 |
| August 2, 2013 , 10:57 pm | Depart USPS Sort Facility | CAPITOL HEIGHTS, MD 20790 |
| August 2, 2013 , 9:19 pm | Processed through USPS Sort Facility | CAPITOL HEIGHTS, MD 20790 |
| July 30, 2013 , 2:29 pm | Unclaimed | FALLS CHURCH, VA 22042 |
| July 11, 2013 , 6:33 am | Arrival at Unit | FALLS CHURCH, VA 22042 |
| July 11, 2013 , 3:21 am | Depart USPS Sort Facility | MERRIFIELD, VA 22081 |
| July 11, 2013 , 2:26 am | Processed through USPS Sort Facility | MERRIFIELD, VA 22081 |
| July 10, 2013 , 3:09 pm | Processed through USPS Sort Facility | MERRIFIELD, VA 22081 |
| July 9, 2013 , 7:37 pm | Depart USPS Sort Facility | GAITHERSBURG, MD 20898 |
| July 9, 2013 , 5:36 pm | Processed through USPS Sort Facility | GAITHERSBURG, MD 20898 |

## Track Another Package

**What's your tracking (or receipt) number?**

Track It

English ⌄    Customer Service    USPS Mol.

Register / Sign In ⌄

**USPS**

Search USPS.com or Track Packages    Q

# USPS Tracking™

Customer Service ›
Have questions? We're here to help.

Tracking Number: 70130600000124167389

IN-TRANSIT

## Product & Tracking Information

Available Actions

**Postal Product:**     Features:
Certified Mail™

| DATE & TIME | STATUS OF ITEM | LOCATION |
| --- | --- | --- |
| July 10, 2013 , 11:09 am | Notice Left | GREENBELT, MD 20770 |



| July 10, 2013 , 9:24 am | Arrival at Unit | GREENBELT, MD 20770 |

## Track Another Package

**What's your tracking (or receipt) number?**

Track It

---

**LEGAL**
Privacy Policy ›
Terms of Use ›
FOIA ›
No FEAR Act EEO Data ›

**ON USPS.COM**
Government Services ›
Buy Stamps & Shop ›
Print a Label with Postage ›
Customer Service ›
Delivering Solutions to the Last Mile ›
Site Index ›

**ON ABOUT.USPS.COM**
About USPS Home ›
Newsroom ›
USPS Service Alerts ›
Forms & Publications ›
Careers ›

**OTHER USPS SITES**
Business Customer Gateway ›
Postal Inspectors ›
Inspector General ›
Postal Explorer ›
National Postal Museum ›

**USPS.COM**    Copyright© 2014 USPS. All Rights Reserved.

**EXHIBIT E**

newspaper for sales of comparable homes, estimates from internet valuation sources, etc.), the servicer must utilize the borrower's evidence and perform the preliminary NPV re-evaluation required, notwithstanding the servicer's disagreement with the borrower's estimate.

If the preliminary re-evaluation performed by the servicer (or MHA Help or HSC as noted above) produces a positive NPV result, the servicer must offer the borrower the opportunity to request an appraisal of the property; provided, however, if the servicer is willing to accept as accurate the borrower's estimate of the property value based on the borrower's submitted evidence, the servicer, subject to investor guidelines, is not required to offer the borrower the opportunity to obtain an appraisal. If an appraisal is obtained, the appraisal will establish the fair market value of the property as of the NPV Date and will be utilized to complete the final NPV re-evaluation. The borrower must, no later than 15 calendar days from the date of notification that the preliminary NPV result is positive, remit a $200 deposit against the full cost of the appraisal in a manner acceptable to the servicer. The balance of the actual appraisal cost will be added to the borrower's total arrearage under the loan. If capitalization of the appraisal cost is prohibited by investor guidelines or applicable law, the servicer is permitted to collect the costs from the borrower in equal installments over a period of no less than 24 months and no greater than 60 months in addition to the borrower's modified monthly mortgage payment. Servicers must maintain evidence of the prohibition in the servicing system and/or mortgage file and provide it to HSC or MHA Help as necessary to resolve any Escalated Case.The appraisal must be completed in accordance with the Uniform Standards of Professional Appraisal Practice by an appraiser that is not affiliated with the servicer and is licensed in the state where the property is located.

Servicers are not required to obtain a new appraisal if the original NPV property value input was established by an appraisal performed in accordance with the standards listed above. The servicer must provide a copy of such appraisal to the borrower.

Upon receipt of the appraisal, the servicer must perform a final NPV re-evaluation using the appraised value and any other NPV input values materially disputed by the borrower. The servicer must provide the final NPV outcome and input values to the borrower and, based on the NPV outcome, proceed in accordance with program guidelines. If the re-evaluation with the new appraised value results in a trial period plan, the balance of the actual appraisal cost will be capitalized in conjunction with the permanent modification.

### 2.3.5 Borrower NPV Calculator

The Borrower NPV Calculator, which can be accessed at Check My NPV.com, allows borrowers to learn about, interact with and better understand the purpose and role of the NPV model in HAMP. Borrowers can use the NPV Calculator to evaluate their potential eligibility for HAMP. In addition, the Borrower NPV Calculator allows borrowers to enter the NPV input values used by the servicer and provided in the Non-Approval Notice to review the servicer's NPV evaluation. These inputs are set forth in the NPV Input Data Fields and Values chart set forth in Exhibit A. However, because a borrower using the Borrower NPV Calculator may not use exactly the same data used by the servicer, the Borrower NPV Calculator will only provide an estimated outcome.

## 3 Protections Against Unnecessary Foreclosure

### 3.1 Suspension of a Referral to Foreclosure

#### 3.1.1 Certain Circumstances

A servicer may not refer any loan to foreclosure or conduct a scheduled foreclosure sale unless and until at least one of the following circumstances exists:

- The borrower is evaluated for HAMP and is determined to be ineligible for the program; or

- The borrower is offered a TPP, but fails to make current trial period payments as set forth in Section 8.3; provided, however, if a servicer is evaluating a borrower for HAMP Tier 2 (either automatically or upon a borrower's request) after the failure of a HAMP Tier 1 TPP, the servicer cannot refer the loan to foreclosure or conduct a scheduled foreclosure sale until such evaluation is completed and the borrower is determined to be ineligible for HAMP Tier 2; or

- The servicer has established Right Party Contact, has sent at least two written requests asking the borrower to supply required information in accordance with Section 2.2.2, and has otherwise satisfied the Reasonable Effort solicitation standard, and the borrower failed to respond by the dates indicated in those requests; or

- The servicer has satisfied the Reasonable Effort solicitation standard without establishing Right Party Contact; or

- The borrower or co-borrower states he or she is not interested in pursuing a HAMP modification and such statement is reflected by the servicer in its servicing system and/or mortgage file; or

- The servicer has resolved the Escalated Case in accordance with Section 3.3 of Chapter I; or

- The remaining non-borrower was unable to assume the note and re-apply for HAMP during the period provided for by the servicer pursuant to Section 8.9.2.

In addition, if the borrower submits an incomplete Loss Mitigation Application, the servicer may not refer the loan to foreclosure unless and until the later of (i) the 120th day of delinquency or (ii) at least 30 calendar days have passed since the date the servicer sent the borrower an Incomplete Information Notice as required under Section 4.5, and provided the borrower's Loss Mitigation Application remains incomplete on the date of referral.

### 3.2 Suspension of Foreclosure Proceedings in Process

With respect to a borrower who submits a request for HAMP consideration after a loan has been referred to foreclosure, the servicer must, immediately upon the borrower's acceptance of a TPP based on verified income, and for the duration of the trial period, take those actions within its authority that are necessary to halt further activity and events in the foreclosure process, whether judicial or non-judicial, including but not limited to refraining from scheduling a sale or causing a judgment to be entered.

The servicer will not be in violation of this Section to the extent that: (a) a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt some or all activities or events in the matter after the servicer has made reasonable efforts to move the court or request the public official for a cessation of the activity or event; (b) the servicer must take some action to protect the interests of the owner, investor, guarantor or servicer of the loan in response to action taken by the borrower or other parties in the foreclosure process; or (c) there is not sufficient time following the borrower's acceptance of the TPP for the servicer to halt the activity or event, provided that in no event shall the servicer permit a sale to go forward. The servicer must document in the servicing file if any of the foregoing exceptions to the requirement to halt an existing foreclosure sale is applicable.

### 3.3 Suspension of Scheduled Foreclosure Sale

When a borrower submits a request for HAMP consideration after a foreclosure sale date has been scheduled and the request is received no later than midnight of the seventh business day prior to the foreclosure sale date (Deadline), the servicer must suspend the sale as necessary to

evaluate the borrower for HAMP. Servicers are not required to suspend a foreclosure sale when: (1) a request for HAMP consideration is received after the Deadline; (2) a borrower received a permanent modification and lost good standing (as described in Section 9.4); (3) a borrower received a TPP offer and failed to make one or more payments under the TPP by the last day of the month in which it was due; or (4) a borrower was evaluated based upon an Initial Package and determined to be ineligible under HAMP requirements.

The servicer will not be in violation of this Section to the extent that a court with jurisdiction over the foreclosure proceeding (if any), or the bankruptcy court in a bankruptcy case, or the public official charged with carrying out the activity or event, fails or refuses to halt the sale after the servicer has made reasonable efforts to move the court or request the public official for a cessation of the sale. The servicer must document in the servicing system and/or mortgage file if the foregoing exception to the requirement to suspend an existing foreclosure sale is applicable.

A borrower is deemed to have requested consideration for HAMP when an Initial Package is received by the servicer or its foreclosure attorney/trustee prior to the Deadline. However, the servicer may establish additional requirements for requests received later than 30 calendar days prior to a scheduled foreclosure sale date, including, for example, a requirement that the Initial Package be delivered through certified/express delivery mail with return receipt/delivery confirmation to either the servicer or the foreclosure attorney/foreclosure trustee. These requirements must be posted on the servicer's Website and communicated to the borrower in writing in accordance with Section 2.2 or through other written communication.

If the borrower contacts the servicer prior to the Deadline, the servicer must inform the borrower of the Deadline and any document submission requirements.

Notwithstanding the foregoing, if a borrower has defaulted on a HAMP Tier 1 TPP or lost good standing on a HAMP Tier 1 permanent modification, a servicer must suspend a foreclosure sale as necessary to evaluate a borrower's loan for HAMP (either if done automatically by the servicer or if the borrower submits a request prior to the Deadline) if any of the following conditions exist:

- the borrower received a HAMP Tier 1 permanent modification of such loan and lost good standing and either (i) 12 months have passed since the effective date of the permanent modification or (ii) the borrower has experienced a change of circumstance;

- the borrower defaulted on a HAMP Tier 1 TPP on such loan after making one or more payments; or

- the borrower was previously evaluated for HAMP Tier 1 on such loan but was determined to be ineligible.

Upon request from a borrower that received a HAMP Tier 1 TPP but failed to make the first trial period payment by the last day of the month in which it was due, a servicer must suspend a foreclosure sale as necessary to re-evaluate the borrower for HAMP if the borrower has experienced a change in circumstance. A servicer is not required to suspend a foreclosure sale when a request for HAMP Tier 1 or Tier 2 consideration is received after the Deadline.

## 3.4 Mitigating Foreclosure Impact

The servicer must take the following actions to mitigate foreclosure impact:

### 3.4.1 Simultaneous Trial Period Plan and Foreclosure Explanation

When a borrower is simultaneously in foreclosure and is either being evaluated for HAMP or is in a TPP, the servicer must provide the borrower with a written notification that explains, in clear language, the concurrent modification and foreclosure processes and that states that even

2006015814.001    BK 18459 0227    05/17/2006 13:01:38

Web Cover Sheet Version 2.0                                    Page 1 of 1

# Fairfax County Land Records
# Cover Sheet

**Instruments**
   TRUST

**Grantor(s)**
   KHAN, AMJAD H_I_N

**Grantee(s)**
   RAGLAND, GEORGE H JR_I_T ,   REITNAUER, TRACY J_I_T

| Consideration | 390,000.00 | Consideration % | 100 | |
|---|---|---|---|---|
| Tax Exemption | | Amount Not Taxed | | |
| DEM Number | | Tax Map Number | 060-2- -36-00-0001- | |
| Original Book | | Original Page | | |
| Title Company | PREMIUM TITLE SERVICES | | Title Case | |
| Property Descr. | LOT 1 KAREN KNOLLS | | | |
| Certified | No | Copies | 0 | Page Range |



```
┌──────────────────────────┐
│    Print Cover Sheet     │
└──────────────────────────┘
```

Parcel Number: 060-2-38-0001

☐ THIS IS A REFINANCE OF A DEED OF TRUST RECORDED IN THE CLERK'S OFFICE, CIRCUIT COURT OF ......................................., VIRGINIA, IN DEED BOOK ................................., PAGE ..............., IN THE ORIGINAL PRINCIPAL AMOUNT OF $ ................................... AND WITH THE OUTSTANDING PRINCIPAL BALANCE WHICH IS $ ......................................... .

This document was prepared by: Mercantile Potomac Bank 702 Russell Avenue Suite 200 Gaithersburg, MD 20877

———— Commonwealth of Virginia ————————————Space Above This Line For Recording Data ————

# THIS IS A CREDIT LINE DEED OF TRUST
### (With Future Advance Clause)

1. **DATE AND PARTIES.** The date of this Credit Line Deed of Trust (Security Instrument) is .05-09-2006................. and the parties and their addresses are as follows:

   **GRANTOR:**

   Amjad H. Khan
   3301 Rose Lane
   Falls Church, VA 22042

   ☐ If checked, refer to the attached Addendum incorporated herein, for additional Grantors, their signatures and acknowledgments.

   **TRUSTEE:**

   George H. Ragland, Jr.                    Tracy J. Reitmeier
   809 Park Avenue                            8119 Boone Boulevard, Suite 102
   Falls Church, VA 22046                    Vienna, VA 22182

   **LENDER:**

   Mercantile Potomac Bank
   A Division of Mercantile-Safe Deposit and Trust Company
   Organized and existing under the laws of the state of Maryland
   702 Russell Avenue Suite 200 Gaithersburg, MD 20877

2. **CREDIT LINE DEED OF TRUST. THIS IS A CREDIT LINE DEED OF TRUST** within the meaning of Section 55-58.2 of the Code of Virginia (1950), as amended. For purposes of such section, (i) the name of the noteholder secured by this Security Instrument is .Mercantile Potomac Bank, A Division of Mercantile-Safe Deposit and Trust Company ..............., (ii) the address at which communications may be mailed or delivered to the noteholder is .702 Russell Avenue Suite 200, Gaithersburg, MD 20877........................................., and (iii) the maximum aggregate principal amount to be secured is .390,000.00.......................................... This limitation of amount does not include interest and other fees and charges validly made pursuant to this Security Instrument. Also, this limitation does not apply to advances made under the terms of this Security Instrument to protect Lender's security and to perform any of the covenants contained in this Security Instrument.

3. **CONVEYANCE.** For good and valuable consideration, the receipt and sufficiency of which is acknowledged, and to secure the Secured Debt (defined below) and Grantor's performance under this Security Instrument, Grantor irrevocably grants, conveys and sells to Trustee, in trust for the benefit of Lender, with power of sale, the following described property:

   ALL of Lot Numbered One (1) of the subdivision known as Karan Knolls being resubdivision of Lots numbered Six (6) and Seven (7) and parts of Lots numbered Ten (10) and Eleven (11), Hickory Hall Estates as the same is duly dedicated, platted and recorded in Deed Book 2121 at page 174, among the land records of Fairfax County, Virginia.

   Parcel ID.# 060-2-38-0001

   The property is located in .Fairfax.............................................................. at .3301 Rose Lane.....................
                                                        (County (or City))
   ........................................................................................................., Virginia .22042...........
   Falls Church
   ............(Address)............                    (City)                    Virginia          (ZIP Code)

   Together with all rights, easements, appurtenances, royalties, mineral rights, oil and gas rights, all water and riparian rights, ditches, and water stock and all existing and future improvements, structures, fixtures, and replacements that may now, or at any time in the future, be part of the real estate described above (all referred to as "Property").

4. **SECURED DEBT AND FUTURE ADVANCES.** The term "Secured Debt" is defined as follows:

   A. Debt incurred under the terms of all promissory note(s), contract(s), guaranty(ies) or other evidence of debt described below and all their extensions, renewals, modifications or substitutions. *(You must specifically identify the debt(s) secured and you should include the final maturity date of such debt(s).)*

   Home Equity Line Agreement dated May 9, 2006, subject to an Annual Renewal.

B. All future advances from Lender to Grantor or other future obligations of Grantor to Lender under any promissory note, contract, guaranty, or other evidence of debt executed by Grantor in favor of Lender after this Security Instrument whether or not this Security Instrument is specifically referenced. If more than one person signs this Security Instrument, each Grantor agrees that this Security Instrument will secure all future advances and future obligations that are given to or incurred by any one or more Grantor, or any one or more Grantor and others. All future advances and other future obligations are secured by this Security Instrument even though all or part may not yet be advanced. All future advances and other future obligations are secured as if made on the date of this Security Instrument. Nothing in this Security Instrument shall constitute a commitment to make additional or future loans or advances in any amount. Any such commitment must be agreed to in a separate writing.

C. All other obligations Grantor owes to Lender, which may later arise, to the extent not prohibited by law, including, but not limited to, liabilities for overdrafts relating to any deposit account agreement between Grantor and Lender.

D. All additional sums advanced and expenses incurred by Lender for insuring, preserving or otherwise protecting the Property and its value and any other sums advanced and expenses incurred by Lender under the terms of this Security Instrument.

In the event that Lender fails to provide any required notice of the right of rescission, Lender waives any subsequent security interest in the Grantor's principal dwelling that is created by this Security Instrument.

5. **DEED OF TRUST COVENANTS.** Grantor agrees that the covenants in this section are material obligations under the Secured Debt and this Security Instrument. If Grantor breaches any covenant in this section, Lender may refuse to make additional extensions of credit and reduce the credit limit. By not exercising either remedy on Grantor's breach, Lender does not waive Lender's right to later consider the event a breach if it happens again.

**Payments.** Grantor agrees that all payments under the Secured Debt will be paid when due and in accordance with the terms of the Secured Debt and this Security Instrument.

**Prior Security Interests.** With regard to any other mortgage, deed of trust, security agreement or other lien document that created a prior security interest or encumbrance on the Property. Grantor agrees to make all payments when due and to perform or comply with all covenants. Grantor also agrees not to allow any modification or extension of, nor to request any future advances under any note or agreement secured by the lien document without Lender's prior written approval.

**Claims Against Title.** Grantor will pay all taxes, assessments, liens, encumbrances, lease payments, ground rents, utilities, and other charges relating to the Property when due. Lender may require Grantor to provide to Lender copies of all notices that such amounts are due and the receipts evidencing Grantor's payment. Grantor will defend title to the Property against any claims that would impair the lien of this Security Instrument. Grantor agrees to assign to Lender, as requested by Lender, any rights, claims or defenses Grantor may have against parties who supply labor or materials to maintain or improve the Property.

**Property Condition, Alterations and Inspection.** Grantor will keep the Property in good condition and make all repairs that are reasonably necessary. Grantor shall not commit or allow any waste, impairment, or deterioration of the Property. Grantor agrees that the nature of the occupancy and use will not substantially change without Lender's prior written consent. Grantor will not permit any change in any license, restrictive covenant or easement without Lender's prior written consent. Grantor will notify Lender of all demands, proceedings, claims, and actions against Grantor, and of any loss or damage to the Property.

Lender or Lender's agents may, at Lender's option, enter the Property at any reasonable time for the purpose of inspecting the Property. Lender shall give Grantor notice at the time of or before an inspection specifying a reasonable purpose for the inspection. Any inspection of the Property shall be entirely for Lender's benefit and Grantor will in no way rely on Lender's inspection.

**Authority to Perform.** If Grantor fails to perform any duty or any of the covenants contained in this Security Instrument, Lender may, without notice, perform or cause them to be performed. Grantor appoints Lender as attorney in fact to sign Grantor's name or pay any amount necessary for performance. Lender's right to perform for Grantor shall not create an obligation to perform, and Lender's failure to perform will not preclude Lender from exercising any of Lender's other rights under the law or this Security Instrument.

**Leaseholds; Condominiums; Planned Unit Developments.** Grantor agrees to comply with the provisions of any lease if this Security Instrument is on a leasehold. If the Property includes a unit in a condominium or a planned unit development, Grantor will perform all of Grantor's duties under the covenants, by-laws, or regulations of the condominium or planned unit development.

**Condemnation.** Grantor will give Lender prompt notice of any pending or threatened action, by private or public entities to purchase or take any or all of the Property through condemnation, eminent domain, or any other means. Grantor authorizes Lender to intervene in Grantor's name in any of the above described actions or claims. Grantor assigns to Lender the proceeds of any award or claim for damages connected with a condemnation or other taking of all or any part of the Property. Such proceeds shall be considered payments and will be applied as provided in this Security Instrument. This assignment of proceeds is subject to the terms of any prior mortgage, deed of trust, security agreement or other lien document.

**Insurance.** Grantor shall keep Property insured against loss by fire, flood, theft and other hazards and risks reasonably associated with the Property due to its type and location. This insurance shall be maintained in the amounts and for the periods that Lender requires. What Lender requires pursuant to the preceding two sentences can change during the term of the Secured Debt. The insurance carrier providing the insurance shall be chosen by Grantor subject to Lender's approval, which shall not be unreasonably withheld. If Grantor fails to maintain the coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property according to the terms of this Security Instrument.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard "mortgage clause" and, where applicable, "loss payee clause." Grantor shall immediately notify Lender of cancellation or termination of the insurance. Lender shall have the right to hold the policies and renewals. If Lender requires, Grantor shall immediately give to Lender all receipts of paid premiums and renewal notices. Upon loss, Grantor shall give immediate notice to the insurance carrier and Lender. Lender may make proof of loss if not made immediately by Grantor.

Unless otherwise agreed in writing, all insurance proceeds shall be applied to the restoration or repair of the Property or to the Secured Debt, whether or not then due, at Lender's option. Any application of proceeds to principal shall not extend or postpone the due date of the scheduled payment nor change the amount of any payment. Any excess will be paid to the Grantor. If the Property is acquired by Lender, Grantor's right to any insurance policies and proceeds resulting from damage to the Property before the acquisition shall pass to Lender to the extent of the Secured Debt immediately before the acquisition.

**Financial Reports and Additional Documents.** Grantor will provide to Lender upon request, any financial statement or information Lender may deem reasonably necessary. Grantor agrees to sign, deliver, and file any

*(page 2 of 4)*



additional documents or certifications that Lender may consider necessary to perfect, continue, and preserve Grantor's obligations under this Security Instrument and Lender's lien status on the Property.

**6.   WARRANTY OF TITLE.** Grantor warrants that Grantor is or will be lawfully seized of the estate conveyed by this Security Instrument and has the right to irrevocably grant, convey and sell the Property to Trustee, in trust, with power of sale. Grantor also warrants that the Property is unencumbered, except for encumbrances of record.

**7.   DUE ON SALE.** Lender may, at its option, declare the entire balance of the Secured Debt to be immediately due and payable upon the creation of, or contract for the creation of, a transfer or sale of all or any part of the Property. This right is subject to the restrictions imposed by federal law (12 C.F.R. 591), as applicable.

**8.   DEFAULT.** Grantor will be in default if any of the following occur:
**Fraud.** Any Consumer Borrower engages in fraud or material misrepresentation in connection with the Secured Debt that is an open end and home equity plan.
**Payments.** Any Consumer Borrower on any Secured Debt that is an open end home equity plan fails to make a payment when due.
**Property.** Any action or inaction by the Borrower that adversely affects the Property or Lender's rights in the Property. This includes, but is not limited to, the following: (a) Grantor fails to maintain required insurance on the Property; (b) Grantor transfers the Property; (c) Grantor commits waste or otherwise destructively uses or fails to maintain the Property such that the action or inaction adversely affects Lender's security; (d) Grantor fails to pay taxes on the Property or otherwise fails to act and thereby causes a lien to be filed against the Property that is senior to the lien of this Security Instrument; (e) a sole Grantor dies; (f) if more than one Grantor, any Grantor dies and Lender's security is adversely affected; (g) the Property is taken through eminent domain; (h) a judgment is filed against Grantor and subjects Grantor and the Property to action that adversely affects Lender's interest; or (i) a prior lienholder forecloses on the Property and as a result, Lender's interest is adversely affected.
**Executive Officers.** Any Borrower is an executive officer of Lender or an affiliate and such Borrower becomes indebted to Lender or another lender in an aggregate amount greater than the amount permitted under federal laws and regulations.

**9.   REMEDIES ON DEFAULT.** In addition to any other remedy available under the terms of this Security Instrument, Lender may accelerate the Secured Debt and foreclose this Security Instrument in a manner provided by law if Grantor is in default. In some instances, federal and state law will require Lender to provide Grantor with notice of the right to cure, or other notices and may establish time schedules for foreclosure actions.
At the option of Lender, all or any part of the agreed fees and charges, accrued interest and principal shall become immediately due and payable, after giving notice if required by law, upon the occurrence of a default or anytime thereafter. Lender shall be entitled to, without limitation, the power to direct the Trustee to execute the trust created hereby by and in so doing exercise all of the powers as set forth in Va. Code Section 55-59.1 through 55-59.4, in effect on the date of this Security Instrument.
If there is a default, Trustee shall at the request of the Lender, advertise and sell all or a whole or in separate parcels at public auction to the highest bidder for cash at such time and place as Trustee designates. Trustee shall give notice of sale including the time, terms and place of sale and a description of the Property to be sold as required by the applicable law in effect at the time of the proposed sale. Advertisement required: Advertisement shall be sufficient if published at least once a week for two weeks, (b) once a day for three days, which may be consecutive days.
Upon sale of any part of the Property, Trustee will make and deliver a special or limited warranty deed that conveys the property sold to the purchaser or purchasers. Under this special or limited warranty deed, Trustee will covenant that Trustee has not caused or allowed a lien or an encumbrance to burden the Property and that Trustee will specially warrant and defend the Property's title to the purchaser or purchasers at the sale against all lawful claims and demand of all persons claiming by, through or under Trustee. The recitals in any deed of conveyance will be prima facie evidence of the facts set forth therein.
Upon sale of the Property, Trustee shall apply the proceeds in the order provided by law. Lender may purchase the Property.
The acceptance by Lender of any sum in payment or partial payment on the Secured Debt after the balance is due or is accelerated or after foreclosure proceedings are filed shall not constitute a waiver of Lender's right to require complete cure of any existing default. By not exercising any remedy on Grantor's default, Lender does not waive Lender's right to later consider the event a default if it continues or happens again.

**10.   SECTION 55-69 OF THE CODE OF VIRGINIA.** This Security Instrument shall be construed to impose and confer upon the parties hereto, and the beneficiaries, all duties, rights and obligations prescribed in Section 55-60 of the Code of Virginia (1950), as amended, and in effect on the date of this Security Instrument, and the following provisions of that section are incorporated in this Security Instrument by short form reference.
A. Exemptions waived.
B. Subject to all upon default.
C. Renewal, extension or reinstatement permitted.
D. Any Trustee may act.
E. Substitution of Trustee permitted.

**11.   EXPENSES; ADVANCES ON COVENANTS; ATTORNEYS' FEES; COLLECTION COSTS.** If Grantor breaches any covenant in this Security Instrument, Grantor agrees to pay all expenses Lender incurs in performing such covenants or protecting its security interest in the Property. Such expenses include, but are not limited to, fees incurred for inspecting, preserving, or otherwise protecting the Property and Lender's security interest. These expenses are payable on demand and will bear interest from the date of payment until paid in full at the highest rate of interest in effect as provided in the terms of the Secured Debt. Grantor agrees to pay all costs and expenses incurred by Lender in collecting, enforcing or protecting Lender's rights and remedies under this Security Instrument. This amount may include, but is not limited to, attorneys' fees, court costs, and other legal expenses. To the extent permitted by the United States Bankruptcy Code, Grantor agrees to pay the reasonable attorneys' fees Lender incurs to collect the Secured Debt as awarded by any court exercising jurisdiction under the Bankruptcy Code. This Security Instrument shall remain in effect until released. Grantor agrees to pay for any recordation costs of such release.

**12.   ENVIRONMENTAL LAWS AND HAZARDOUS SUBSTANCES.** As used in this section, (1) Environmental Law means, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA, 42 U.S.C. 9601 et seq.), and all other federal, state and local laws, regulations, ordinances, court orders, attorney general opinions or interpretive letters concerning the public health, safety, welfare, environment or a hazardous substance; and (2) Hazardous Substance means any toxic, radioactive or hazardous material, waste, pollutant or contaminant which has characteristics which render the substance dangerous or potentially dangerous to the public health, safety, welfare or environment. The term includes, without limitation, any substances defined as "hazardous material," "toxic substances," "hazardous waste," "hazardous substance," or "regulated substance" under any Environmental Law.

(page 3 of 4)

BK 1459 0230

Grantor represents, warrants and agrees that:

    A. Except as previously disclosed and acknowledged in writing to Lender, no Hazardous Substance is or will be located, stored or released on or in the Property. This restriction does not apply to small quantities of Hazardous Substances that are generally recognized to be appropriate for the normal use and maintenance of the Property.

    B. Except as previously disclosed and acknowledged in writing to Lender, Grantor and every tenant have been, are, and shall remain in full compliance with any applicable Environmental Law.

    C. Grantor shall immediately notify Lender if a release or threatened release of a Hazardous Substance occurs on, under or about the Property or there is a violation of any Environmental Law concerning the Property. In such an event, Grantor shall take all necessary remedial action in accordance with any Environmental Law.

    D. Grantor shall immediately notify Lender in writing as soon as Grantor has reason to believe there is any pending or threatened investigation, claim, or proceeding relating to the release or threatened release of any Hazardous Substance or the violation of any Environmental Law.

13. **ESCROW FOR TAXES AND INSURANCE.** Unless otherwise provided in a separate agreement, Grantor will not be required to pay to Lender funds for taxes and insurance in escrow.

14. **JOINT AND INDIVIDUAL LIABILITY; CO-SIGNERS; SUCCESSORS AND ASSIGNS BOUND.** All duties under this Security Instrument are joint and individual. If Grantor signs this Security Instrument but does not sign an evidence of debt, Grantor does so only to mortgage Grantor's interest in the Property to secure payment of the Secured Debt and Grantor does not agree to be personally liable on the Secured Debt. If this Security Instrument secures a guaranty between Lender and Grantor, Grantor agrees to waive any rights that may prevent Lender from bringing any action or claim against Grantor or any party indebted under the obligation. These rights may include, but are not limited to, any anti-deficiency or one-action laws. The duties and benefits of this Security Instrument shall bind and benefit the successors and assigns of Grantor and Lender.

15. **SEVERABILITY; INTERPRETATION.** This Security Instrument is complete and fully integrated. This Security Instrument may not be amended or modified by oral agreement. Any section in this Security Instrument, attachments, or any agreement related to the Secured Debt that conflicts with applicable law will not be effective, unless that law expressly or impliedly permits the variations by written agreement. If any section of this Security Instrument cannot be enforced according to its terms, that section will be severed and will not affect the enforceability of the remainder of this Security Instrument. Whenever used, the singular shall include the plural and the plural the singular. The captions and headings of the sections of this Security Instrument are for convenience only and are not to be used to interpret or define the terms of this Security Instrument. Time is of the essence in this Security Instrument.

16. **SUCCESSOR TRUSTEE.** Lender, at Lender's option, may from time to time remove Trustee and appoint a successor or successors to any trustee without any other formality than the designation in writing. The successor or any successors to any trustee, without conveyance of the Property, shall succeed to all the title, power and duties conferred upon Trustee by this Security Instrument and applicable law.

17. **NOTICE.** Unless otherwise required by law, any notice shall be given by delivering it or by mailing it by first class mail to the appropriate party's address on page 1 of this Security Instrument, or to any other address designated in writing. Notice to one grantor will be deemed to be notice to all grantors.

18. **WAIVERS.** Except to the extent prohibited by law, Grantor waives the benefit of the homestead exemption as to this obligation and any rights of appraisement and reinstatement. GRANTOR HEREBY EXPRESSLY WAIVES AND RELEASES ANY REQUIREMENT OR OBLIGATION THAT THE LENDER OR THE TRUSTEE PRESENT EVIDENCE OR OTHERWISE PROCEED BEFORE ANY COURT, CLERK, OR OTHER JUDICIAL OR QUASI-JUDICIAL BODY BEFORE EXERCISE OF THE POWERS OF SALE CONTAINED IN THIS SECURITY INSTRUMENT AND IN SECTION 55-59 AND SECTIONS 55-59.1 THROUGH 55-59.4 OF THE CODE OF VIRGINIA (1950), AS AMENDED.

19. **LINE OF CREDIT.** The Secured Debt includes a revolving line of credit. Although the Secured Debt may be reduced to a zero balance, this Security Instrument will remain in effect until released.

20. **APPLICABLE LAW.** This Security Instrument is governed by the laws as agreed to in the Secured Debt, except to the extent required by the laws of the jurisdiction where the Property is located, and applicable federal laws and regulations.

21. **RIDERS.** The covenants and agreements of each of the riders checked below are incorporated into and supplement and amend the terms of this Security Instrument.
[Check all applicable boxes]
☐ Assignment of Leases and Rents    ☐ Other ...................................................................

22. ☐ **ADDITIONAL TERMS.**


**SIGNATURES:** By signing below, Grantor agrees to the terms and covenants contained in this Security Instrument and in any attachments. Grantor also acknowledges receipt of a copy of this Security Instrument on the date stated on page 1.

Witness the following signatures and seals.

.......................................... 5/9/06 ............................................
(Signature) Amjad H. Khan     (Date)       (Signature)            (Date)

**ACKNOWLEDGMENT:**
COMMONWEALTH OF Virginia............................, COUNTY (OR CITY) OF Fairfax ...............} ss.
(Individual) This instrument was acknowledged before me this 9th ......... day of May, 2006.............
by Amjad H. Khan ..........................................................................................
My commission expires: 01-31-07
(Seal)

ARTHUR M. INGALLS
NOTARY PUBLIC
MY COMMISSION EXPIRES
01/31/07
COMMONWEALTH OF VIRGINIA

(page 4 of 4)

ExSereP ©1994 Bankers Systems, Inc., St. Cloud, MN Form OCP-REDT-VA 5/10/2005